UNITED STATES, Appellee

v.

Kevin A. KITTS, Senior Airman
U.S. Air Force, Appellant.

No. 94–1302.
CMR No. 30459.

U.S. Court of Appeals for
the Armed Forces.

Argued June 1, 1995.

Decided Sept. 26, 1995.

For Appellant: *Captain Marge A. Overly* (argued); *Colonel Jay L. Cohen* (on brief).

For Appellee: *Colonel Thomas E. Schlegel* (argued); *Colonel Jeffery T. Infelise* (on brief).

*Opinion of the Court*

GIERKE, Judge:

1. A general court-martial composed of officers and enlisted members convicted appellant, contrary to his pleas, of suffering government property to be damaged through neglect; as well as stealing military property of the United States and wrongfully appropriating military property of the United States (both alleged in the same specification), in violation of Articles 108 and 121, Uniform Code of Military Justice, 10 USC §§ 908 and 921, respectively. The approved sentence provides for a bad-conduct discharge, confinement for 30 days, forfeiture of $100.00 pay, and reduction to the lowest enlisted grade.

2. In an unpublished opinion the Court of Military Review * set aside the conviction of suffering government property to be damaged through neglect. That court reassessed the sentence and found it appropriate as adjudged. The court affirmed the convictions of the single specification of larceny and wrongful appropriation and the sentence, after rejecting appellant's challenge of the search of his quarters.

3. We granted review of the following issue:

WHETHER THE MILITARY JUDGE ERRED WHEN HE FOUND APPELLANT VOLUNTARILY CONSENTED TO A SEARCH OF HIS ON–BASE HOME AND GARAGE, WHEN SUCH CONSENT WAS OBTAINED AFTER THIRTEEN GOVERNMENT AGENTS HAD SEARCHED APPELLANT'S HOME AND GARAGE, PHOTOGRAPHED THE CONTENTS OF THE HOME AND GARAGE, REMOVED SUSPECTED GOVERNMENT PROPERTY FROM THE HOME AND GARAGE, AND REQUESTED THAT APPELLANT, HIS WIFE, AND THEIR GUEST ASK PERMISSION TO MOVE AROUND THE HOUSE AND BE ESCORTED WHENEVER THEY LEFT THE LIVING ROOM.

We now hold that the military judge did not abuse his discretion by denying the motion to suppress.

*Factual Background*

4. Appellant resided in government quarters at Kirtland Air Force Base, New Mexico. The charges were based on evidence seized from these quarters. At trial appellant moved to suppress the physical evidence as well as testimony regarding witnesses' observations of evidence. The military judge denied the motion to suppress. His ruling was preceded by extensive findings of fact, including the following:

On 21 January 1992, a Kirtland Air Force Base craftsman responded to the accused's home in response to a complaint of a backed up sewer. The repairman visited the home, corrected the problem, but then notified Mister Bickett of the Kirtland Air Force Base Housing office that the accused's house was filthy and unsanitary and that Mister Bickett ought to look at it. Mister Bickett called the 542nd EMS on 22 January 1992, and spoke to Lieutenant Bourgeois and told him what the repairman had told him. Mister Bickett told him to form an environmental inspection team for the purpose of investigating the complaint and to conduct a no-notice inspection of the quarters. The team members normally consist of a representative from the member's squadron, the Housing office, public health, the fire department, the security police, and sometimes an alert photographer.

Lieutenant Bourgeois received the telephone call from Mister Bickett at about 11:45 on 22 January 1992.... Lieutenant Bourgeois is the 542nd EMS Squadron Section Commander. He asked Master Sergeant Furry, the unit's First Sergeant, to accompany him.

They arrived at the accused's quarters at about 1200 hours. Master Sergeant Furry knocked on the door, which was answered by Mrs Kitts. Master Sergeant Furry asked her if he could speak to Kevin, and she left the door to get the accused, who was asleep. The accused came to the door, barefoot with no shirt on, wearing only a pair of pants. The accused worked a swing shift the day before, from 1530 to 2330 hours, and had gone to bed about 0230 the morning of 22 January. Master Sergeant Furry says he told the accused, "We have received a complaint from the housing office. Is it all right if the Lieutenant and I come in and look?" And the accused then invited them in.

The accused says Master Sergeant Furry said the Housing office had called them about a complaint of excess dog feces in the back yard, and they needed to check it out. The accused says he said, "No problem, you can walk through the house to get to the back yard via the sliding glass door on the back side of the house, or words to that effect." He says no mention was

* *See* 41 MJ 213, 229 n. * (1994).

made concerning the examination of the interior of the house. I find the testimony of Master Sergeant Furry to be more credible based upon Lieutenant Bourgeois' corroboration and what Mister Bickett told them to check out, which was both the interior and exterior of the house. Under either version of the facts, the accused voluntarily invited Lieutenant Bourgeois and Master Sergeant Furry into his house.

Upon entering the house, they entered the living room, the dining room, and the kitchen. Animal feces and urine, trash, and clothes were strewn throughout the part of the house that they could see, and the smell was overwhelming. Master Sergeant Furry asked the accused if he could use his phone; permission was granted, and Master Sergeant Furry called the Law Enforcement desk, asking for a security policeman and an alert photographer. Master Sergeant Furry suspected the accused of damaging government property when he walked into the kitchen and saw the damage to the cabinet.

The security policeman, Staff Sergeant Briske, arrived at the accused's quarters about 12:10 to 12:15, followed by the alert photographer, Airman First Class Morrison, shortly thereafter. Lieutenant Bourgeois called the 542nd EMS Commander, Major Oberer, about 12:15 to 12:20, and asked him to come to the accused's quarters. He arrived about 12:30. While waiting for the different parties to arrive, Master Sergeant Furry walked through the house, stepping into each room to observe its condition. He also opened the garage door, surveyed the scene, which included several auto engines on the floor, then closed the door. He did not observe any government property on the premises during this survey. Lieutenant Bourgeois, after making his phone call to Major Oberer, stepped back outside to the front of the quarters because the smell was making him nauseated.

When Staff Sergeant Briske arrived, he was responding to a request to investigate a complaint of damage to government property. He met Master Sergeant Furry and Lieutenant Bourgeois outside the front of the quarters where he was informed they were conducting a health and welfare inspection and Master Sergeant Furry had seen damage to government property. The three of them went back to the front door of the quarters, whereupon the accused opened the door for them, letting all three into the house.

No one asked for additional permission to come in the house again, nor did the accused protest their return back into the house nor protest the entry of Staff Sergeant Briske. Master Sergeant Furry then escorted Sergeant Briske and Lieutenant Bourgeois through the rooms in the house. They would walk into each room, look, then move on to the next room.... None of them observed any government property at that time. Sergeant Briske also called the Law Enforcement desk asking for an alert photographer, and also asked them to contact the public health officer, Housing officer, and fire department.

Airman First Class Morrison, the alert photographer, arrived about this time. Lieutenant Bourgeois went outside to wait for the arrival of Major Oberer, the Commander. Master Sergeant Furry and Sergeant Briske escorted Airman First Class Morrison around the house, pointing out the areas and things they wanted photographed.

During this time period, the accused, his wife, and eventually a female house guest, were free to move around the house. The only instructions they were given was when Mrs Kitts attempted to clean up some of the feces or do the dishes. She was told to stop and may have been told to stop because she was "destroying evidence." The accused describes his reaction to all of this as embarrassed and unable to speak. However, everyone else describes his reaction as ranging from sleepy to lackadaisical to noncaring to viewing it all as a joke.

Major Oberer was the next to arrive at about 12:30. He was met by Lieutenant Bourgeois on the front lawn. They approached the house and Master Sergeant

Furry let them into the house. The accused and his wife were sitting in the living room at this time. No one asked the accused for permission for Major Oberer to enter the house, nor did the accused protest his entry into the house. The accused saw Major Oberer enter the house, but neither of them said anything to the other.

Major Oberer was escorted by Master Sergeant Furry, Lieutenant Bourgeois, and Sergeant Briske. After showing him the kitchen, Master Sergeant Furry left the house for one to one-and-a-half hours because of a previous appointment at the dormitories.... When Major Oberer entered the garage, stepped in several feet, turned on the light, he then noticed on the floor in front of him blue caps of the type used to cap off aircraft hydraulic lines, and across the garage a red toolbox with the letters H–3, which appeared to be the type used in the helicopter maintenance area. Major Oberer informed both Lieutenant Bourgeois and Sergeant Briske that he thought there was government property in the garage, and both went back to see for themselves. No one moved any property, and they limited their visual search to what was in plain view.

The three of them then closed the door leading from the dining room into the garage and discussed what to do next. In a standard conversational tone, Major Oberer told Sergeant Briske, "I think we need search authorization." He did not direct Sergeant Briske to get search authorization, but was turning to him for advice on what to do next. The three of them then went outside. Sergeant Briske had never been involved before in a case in which he had to obtain search authorization from the installation Commander. Every search he had been involved with he had been able to obtain the consent of the subject by using the Air Force Form 1364, Consent for Search and Seizure.

Sergeant Briske did not have any of these forms in his patrol car, so he decided to go to the Law Enforcement desk to obtain some of the forms. Because he was concerned about the possibility of destruction of evidence, he asked two other security policemen to keep the accused, his wife, and guest under observation.... Sergeant Briske instructed Major Oberer not to look through the house any more until he obtained consent or a search authorization.

Sergeant Briske returned to the Law Enforcement offices, where he asked Tech Sergeant Traxler to come to the accused's quarters to assist him. Sergeant Traxler arrived at the accused's quarters at about 1330. Sergeant Briske filled out the Air Force Form 1364 in advance, then went to the accused's front door and asked the accused to please step outside, he needed to talk to him. Before doing so, he had seized a paint can from the garage which looked like government property and which was in plain view. The accused had a shirt and pants on, but no shoes or socks. The temperature was moderate, and the accused neither complained about the cold nor requested to put on his shoes.

The accused says he was escorted from the house for purposes of signing the consent form by Tech Sergeant Willem. And he was told by Sergeant Willem that someone needs to read him his rights. This is disputed by both Sergeant Briske and Sergeant Traxler who say Sergeant Briske escorted the accused from the house, no one mentioned advising the accused of his rights, and Sergeant Willem did not arrive on the scene until 1730. Reviewing Appellate Exhibit VI, it is more likely this comment was made by Sergeant Willem when the accused was apprehended and escorted from his house to the Law Enforcement offices around 1730 to 1745.

The accused was escorted to the end of his driveway where Sergeant Traxler witnessed what occurred, and Sergeant Briske read the Air Force Form 1364 to the accused. Periodically, he would ask the accused if he understood, and the accused said yes. He had the accused initial on the form that he was suspected of theft of government property as well as the area they wanted to search, and then had the accused sign the form. The accused says

he asked Sergeant Briske what he would do if the accused did not sign the consent form, and he says Sergeant Briske said he would get a warrant. Both Sergeant Briske and Sergeant Traxler deny the accused had any questions, and there was no discussion of what would happen if the accused did not consent. I find the testimony of the security policemen more credible on this point. The accused was not advised of his Article 31 [UCMJ, 10 USC § 831] rights prior to obtaining his consent to search.

Between the time period that Sergeant Briske left the accused's residence shortly before 1300 and returned about 1330 with the Air Force Form 1364, several other people arrived at the house, including Mister Bickett from the Housing office, a fire inspector, and a public health officer. Major Oberer says everything stopped until the "authorization" was received, and no one was searching while the consent was being obtained.

Mister Bickett says he arrived at the accused's quarters after Major Oberer arrived. Mister Bickett brought the rest of the health and welfare inspection team with him. They were asked to wait about five minutes after they arrived before beginning their inspection by Major Oberer. Mister Bickett does not know the reason for the delay.

When Mister Bickett did enter the quarters, he said the reason was to look for damage, whereas the others were looking for cleanliness. Mister Bickett did not look in the garage because other people were already in the garage. Sergeant Briske says Mister Bickett's team did not arrive all at once. He says they may have been entering the house to use the phone, but they were not "searching" until after the consent form was signed.

The accused says prior to signing the consent form, the fire inspector had already done his walkthrough. Lieutenant Bourgeois says that Mister Bickett and the fire inspector had already been through the house and were ready to leave when Sergeant Briske returned with the consent forms. Sergeant Traxler says 15 minutes after arriving at the scene, and prior to consent being obtained from the accused, he saw Mister Bickett outside of the quarters, and Mister Bickett told him he saw a government paint can and damage to government property.

I find that prior to obtaining consent to search from the accused, at least Mister Bickett and the fire inspector had also done a walkthrough of the quarters. There is no evidence that the accused or his wife were asked to give permission before these people nor the photographer entered the quarters, nor is there any evidence that they objected to their presence either.

5. The written consent signed by appellant recites that he had been advised that he was suspected of "theft of government property." It includes the following acknowledgments:

> I know that I have the legal right to either consent to a search, or to refuse to give my consent. I understand that, if I do consent to a search, anything found in the search can be used against me in a criminal trial or in any other disciplinary or administrative procedure. I also understand that, if I do not consent, a search cannot be made without a warrant or other authorization recognized in law.
>
> \*　　\*　　\*
>
> Before deciding to give my consent, I carefully considered this matter. I am giving my consent voluntarily and of my own free will, without having been subjected to any coercion, unlawful influence or unlawful inducement and without any promise of reward, benefit, or immunity having been made to me....

6. The military judge examined the factors in favor of each side and concluded that appellant had consented, after having rejected the Government's argument that the evidence was seized during a valid inspection under Mil.R.Evid. 313, Manual for Courts-Martial, United States, 1984.

### Discussion

7. If the prosecution relies on consent to establish "the lawfulness of a search,

it has the burden of proving" at trial that the purported "consent was freely and voluntarily given." *United States v. Goudy*, 32 MJ 88, 90 (CMA 1991), *citing Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Consent must be proven by "clear and convincing evidence." Mil.R.Evid. 314(e)(5). "Whether an accused consented to a search is a question of fact." *United States v. Kosek*, 41 MJ 60, 64 (CMA 1994), *citing United States v. Wallace*, 11 MJ 445, 448 (CMA 1981). The question whether an accused has consented should be "resolved by examining 'the totality of the circumstances.'" *United States v. Kosek, supra*, quoting *United States v. Goudy*, 32 MJ at 90 and *United States v. Murphy*, 39 MJ 486, 489 (CMA 1994). *See Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973) ("Voluntariness [of a consent to search] is a question of fact to be determined from all the circumstances...."); *United States v. McClain*, 31 MJ 130, 133 (CMA 1990) ("[W]e look at the facts and circumstances surrounding the consent to determine if in fact it is voluntary...."). *See also United States v. Watson*, 423 U.S. 411, 424–25, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976); *United States v. Goudy*, 32 MJ at 91; and *United States v. Middleton*, 10 MJ 123, 133–34 (CMA 1981) (discussing factors to be considered in determining whether consent was voluntarily given).

■ 8. On appeal the evidence will be viewed "in the light most favorable to the Government." *United States v. Goudy*, 32 MJ at 90, *citing United States v. Lowry*, 2 MJ 55, 59 (CMA 1976). We will not overturn a military judge's finding that a consent to a search was voluntary unless it is unsupported by the evidence or clearly erroneous. *United States v. Kosek*, 41 MJ at 64, *citing United States v. Middleton*, 10 MJ at 133.

■ 9. In this case the military judge meticulously examined "the totality of the circumstances," resolved inconsistencies in the evidence, evaluated the witnesses' credibility, made extensive findings of fact, applied the *Middleton* factors, and found that appellant consented. The military judge's finding is amply supported by the evidence, and his ruling was based on a correct view of the law. Accordingly, we will not overturn it.

### Decision

The decision of the United States Air Force Court of Military Review is affirmed.

Judges COX, CRAWFORD, and WISS concur.

SULLIVAN, Chief Judge (concurring):

10. I join in affirming this conviction since the military judge did not abuse his discretion in ruling on the search issue. Moreover, if he did err, I would still vote to affirm under inevitable discovery as stated in *United States v. Roa*, 24 MJ 297, 303 (CMA 1987) (Sullivan, J., concurring in the result). *See Nix v. Williams*, 467 U.S. 431, 442, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984).