UNITED STATES, Appellant

v.

Joshua KATSO, Airman Basic
U.S. Air Force, Appellee

No. 14-5008

Crim. App. No. 38005

United States Court of Appeals for the Armed Forces

Argued October 7, 2014

Decided June 30, 2015

RYAN, J., delivered the opinion of the Court, in which BAKER, C.J., and ERDMANN and STUCKY, JJ., joined. OHLSON, J., filed a separate dissenting opinion.


Counsel


For Appellant:  Captain Thomas J. Alford (argued); Colonel Don M. Christensen and Gerald R. Bruce, Esq. (on brief).

For Appellee:  Major Nicholas D. Carter (argued); Major Isaac C. Kennen.

Amicus Curiae for Appellant:  Anece Baxter White, Esq. (on brief) – Defense Forensic Science Center/United States Army Criminal Investigation Laboratory.

Military Judges:  William C. Muldoon Jr. and Matthew D. Van Dalen


**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

Judge RYAN delivered the opinion of the Court.

Appellee was convicted, contrary to his pleas, by a general court-martial composed of officer and enlisted members of one specification of aggravated sexual assault, one specification of burglary, and one specification of unlawful entry, in violation of Articles 120, 129, and 134, UCMJ, 10 U.S.C. §§ 920, 929, 934. United States v. Katso, 73 M.J. 630, 632 (A.F. Ct. Crim. App. 2014). Appellee was sentenced to confinement for ten years, a dishonorable discharge, and forfeiture of all pay and allowances. Id. The convening authority approved the sentence. Id. The United States Air Force Court of Criminal Appeals (CCA) set aside and dismissed the findings and sentence, holding that the testimony of a Government expert witness was based on a testimonial report written by an out-of-court declarant, thereby violating Appellee's right to confrontation under the Sixth Amendment of the United States Constitution. Id. at 638-40, 642.

The Judge Advocate General of the Air Force certified the following issue to this Court:

> WHETHER THE AIR FORCE COURT OF CRIMINAL APPEALS ERRED
> WHEN IT FOUND APPELLEE'S SIXTH AMENDMENT RIGHT TO
> CONFRONTATION WAS VIOLATED WHEN THE MILITARY JUDGE
> PERMITTED, OVER DEFENSE OBJECTION, THE TESTIMONY OF
> THE GOVERNMENT'S DNA EXPERT, AND THAT THE ERROR WAS
> NOT HARMLESS.

United States v. Katso, 14-5008/AF

This case requires us to examine the application of the Sixth Amendment to testimony relating the results of forensic analysis that was the product of collaboration among a number of laboratory employees. When an expert's knowledge and opinions are based in part on tests performed by others, what may the expert tell the factfinder without violating the defendant's right to confrontation? To answer this question, we apply the frameworks developed by the Supreme Court and by this Court to a set of facts that neither court has considered.

We hold that the testimony of the Government's forensic expert witness, David Davenport, did not violate Appellee's right to confrontation. Unlike the experts in Bullcoming v. New Mexico, 131 S. Ct. 2705, 2715 (2011), and United States v. Blazier (Blazier II), 69 M.J. 218, 226 (C.A.A.F. 2010), Mr. Davenport's personal knowledge regarding the derivation of the evidence at issue made him neither a "surrogate" expert, Bullcoming, 131 S. Ct. at 2715, nor a mere "conduit" for the testimonial statements of another. Blazier II, 69 M.J. at 225; see also Williams v. Illinois, 132 S. Ct. 2221, 2241 (2012). Mr. Davenport conducted a thorough review of the entire case file, including the documents submitted with the evidence, the tests performed on the evidentiary samples, and the quality control measures. He personally compared the DNA profiles from the evidentiary samples to the DNA profiles from the known

3

samples, reran the statistical analysis, and formulated his own carefully considered conclusions. Much of the data underlying his opinion was not testimonial, and, assuming arguendo that the report prepared for his technical review was testimonial, Mr. Davenport did not act as a mere conduit for the report. See Memorandum from Robert Fisher, Forensic DNA Examiner, to Commander, Air Force Office of Special Investigations, Detachment 320 (Jan. 28, 2011) [hereinafter Final Report]. The military judge's denial of Appellee's motion to exclude the expert's testimony was not an abuse of discretion, and the decision of the CCA is reversed.

## I. FACTS

### A. Collecting and Analyzing the DNA Evidence

On the morning of December 11, 2010, Senior Airman (SrA) CA reported that she had been raped, and identified Appellee as the perpetrator. Agents from the Air Force Office of Special Investigations (AFOSI) promptly brought SrA CA to the hospital for an examination. A Sexual Assault Nurse Examiner (SANE) testified that she collected, among other items, vaginal, oral, and rectal swabs from SrA CA, a blood sample, and debris from SrA CA's clothing. The nurse examiner handed these samples to an AFOSI agent. Another SANE testified that she collected Appellee's blood and saliva, obtained penile and scrotal swabs, and handed the samples to an AFOSI agent.

AFOSI Special Agent (SA) Richard Blair testified at trial that he received the samples from the two agents who had been at the hospital. The samples were combined into two separate "sexual assault kits," containing samples from Appellee and SrA CA, respectively. SA Blair explained that the agents who received the samples prepared a set of documents to accompany each kit, which SA Blair reviewed. SA Blair sent this evidence and documents to the United States Army Criminal Investigation Laboratory (USACIL), enclosing a request form that described each piece of evidence and listed identifying numbers for the evidence.[1]

B. Mr. Davenport's Testimony on the Motion to Suppress

Robert Fisher, the USACIL employee responsible for the initial analysis of the sexual assault kits, was in Florida

---

[1] The filled-out forms that accompanied the kits are not in the record. However, SA Blair noted that Dep't of the Air Force Form 52, Evidence Tag (July 1986) [hereinafter AF Form 52], was included with each kit. Mr. Davenport also stated that a "chain of custody" document and a "laboratory exam request" accompany all evidence arriving at USACIL through the mail. Dep't of the Army Form 4137, Evidence/Property Custody Document (July 1976) [hereinafter DA Form 4137], and Dep't of Defense Form 2922, Forensic Laboratory Examination Request (July 2006) [hereinafter DD Form 2922], are the forms submitted to USACIL with evidence. See Dep't of the Air Force, Instr. 31-206, Security Forces Investigations Program para. 2.7.1.10 (Sept. 16, 2009) (describing procedures for submission of evidence by Air Force Security Forces). While we do not know what information was filled out in this case, the generic forms -- AF Form 52, DA Form 4137, and DD Form 2922 -- request the names of the party or parties from whom the evidence was derived.

during the court-martial to be by his mother's side while she underwent major surgery. The Government notified the defense that it would elicit testimony about the forensic analysis from Mr. Davenport, who conducted the technical review of Mr. Fisher's analysis. At the time of the trial, Mr. Davenport had worked as a forensic DNA examiner at USACIL for more than six years. Appellee made a motion in limine to exclude Mr. Davenport's testimony, arguing that such testimony would violate his right to confrontation. In an Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2012), session, Mr. Davenport testified both about the steps that USACIL technicians follow to process evidence in cases of alleged sexual assault and his own role in reviewing and testing the evidence in this case.

i. USACIL's Procedure for Processing Evidence

Testifying during the hearing on the motion to suppress, Mr. Davenport described the path of sexual assault kits through USACIL. First, employees in the evidence processing section receive the evidence. They then scan and save an electronic copy of the forms accompanying the evidence into a "case file" on the laboratory's computer system. The "case examiner" checks the evidence out of the evidence processing section, breaks the seal on the evidence, and checks the forms that accompanied the package against the evidence to ensure that the lab received all items reflected therein. The examiner then inventories the

evidence, verifies that the evidence was properly sealed, and notes any irregularities with the evidence. The examiner is required to document any accidents or mistakes that occurred during the tests.

The case examiner performs a serological examination, which entails looking for traces of semen on the evidence collected from the victim. Various steps of this exam require the examiner to record his visual observations.[2] The examiner then creates DNA profiles from the "evidentiary samples" -- the samples identified by the serology exam and the swabs collected during the SANE's examination of the suspect -- and creates DNA profiles from the blood or saliva of the parties, the "known samples." To create a DNA profile, the examiner must "purify" the DNA, extracting it from the sample; determine the quantity and type of DNA present using an instrument that generates a computer printout; copy portions of the DNA; and use another instrument to produce the machine-generated data that comprises the DNA profile.

---

[2] Mr. Davenport reviewed observations recorded during the testing process, such as these, along with Mr. Fisher's other notes and data, to determine that proper protocol was followed. Mr. Davenport did not rely on some assertion or assurance by Mr. Fisher (which resides nowhere in the record), as the dissent proposes. United States v. Katso, __ M.J. __, __ (6) (C.A.A.F. 2015) (Ohlson, J., dissenting).

The examiner compares the DNA profiles from the evidentiary samples to the DNA profiles from the known samples. Based on this comparison, the examiner determines whether any sample identified by the serology exam contains a DNA profile matching the DNA from the known sample of the suspect, and whether any swab collected from the suspect contains a DNA profile matching DNA from the known sample of the victim. For each match, the examiner calculates the probability that the DNA profile on the evidentiary sample would match an unrelated individual selected at random from the American population. The examiner then drafts a report summarizing these results.

### ii. Mr. Davenport's Technical Review

As the "technical reviewer," Mr. Davenport was required to verify Mr. Fisher's results and approve the Final Report, which Mr. Fisher drafted. In the Article 39(a) session, Mr. Davenport outlined the steps he took to review Mr. Fisher's work. According to Mr. Davenport, his review focused on the items in the case file, which contained, inter alia, the request for analysis and forms submitted by AFOSI, Mr. Fisher's handwritten notes, records of the quality control measures used during testing, all printouts generated during the testing process, the raw DNA profile data, and the Final Report. Mr. Davenport neither handled the initial evidence submitted nor observed Mr. Fisher's testing procedures.

8

Mr. Davenport verified that Mr. Fisher followed protocol and properly documented each step, and that the protocol utilized by USACIL is widely accepted in the field of forensic DNA analysis. Mr. Davenport testified that USACIL procedures require many quality control measures, such as running positive and negative controls, recording the lot numbers of the chemicals used, processing an unrelated known DNA sample along with the samples at issue, and processing test tubes that contain reagent but not DNA. Mr. Davenport testified that he was able to determine, based on the contents of the case file, that Mr. Fisher took these measures.

Mr. Davenport explained that, since Mr. Fisher was required to document accidents or mistakes, he could determine whether any accidents occurred or whether Mr. Fisher made any mistakes by reviewing Mr. Fisher's notes. Additionally, he would have been able to catch undocumented mistakes by checking for irregularities in the results. For example, Mr. Davenport checked that the quality control sample produced the expected results and that known samples produced correctly gendered profiles. Logically inconsistent results -- such as a complete male profile in non-semen DNA taken from the victim or a complete female profile generated from DNA supposedly extracted from semen -- could signify a mix-up. Additionally, the presence of a DNA profile not matching a known sample could

indicate contamination. These objective measures enable the technical reviewer to determine that cross-contamination did not occur.

Mr. Davenport independently compared the DNA profiles of the evidentiary and known samples to verify the matches. This involved processing the machine-generated raw profile data using a computer program and interpreting the profiles to detect matches between the samples. Mr. Davenport then recalculated the probability of a match between the DNA profiles for each matching evidentiary sample and an individual selected at random from the American population. Based on review and interpretation of all of the above, Mr. Davenport determined that he agreed with Mr. Fisher's results and initialed the Final Report, allowing the report to progress to the next stage of the review process.

iii. Military Judge's Ruling on Motion to Exclude Testimony

Relying on Mr. Davenport's motions testimony detailing his knowledge of and involvement in the testing process, the military judge concluded that "Mr. Davenport's opinions will be based on his training and experience, and his review of the entire case," and denied Appellee's motion. The military judge found that Mr. Davenport analyzed the raw data "to ensure he reached the same results and conclusions as Mr. Fisher had," and noted that Mr. Davenport explained he had "review[ed] the case

from beginning to end." The ruling permitted Mr. Davenport to state his "opinion concerning the reliability of testing procedures used in this case, the findings/results in this case and the frequency statistics" only "[s]o long as Mr. Davenport does not become a conduit of inadmissible testimonial hearsay."

### C.   Mr. Davenport's Court-Martial Testimony

Mr. Davenport testified before members as an expert, providing his independent opinion on the results of the DNA analysis. Mr. Davenport told members that, as the technical reviewer, he based his opinions on his review of the case file. The Final Report was not admitted into evidence. Mr. Davenport only referenced the Final Report to note that he reviewed Mr. Fisher's interpretation of the results and checked the Final Report against the documents submitted by AFOSI to make sure that the report properly listed and identified the items submitted as evidence.[3] Based on his review of the entire case file, Mr. Davenport testified that:

1.  The evidence collected from SrA CA and Appellee was tested "per protocol,"

2.  The evidence was received in a sealed condition,

3.  The evidence was inventoried properly,

4.  The known samples were analyzed properly,

---

[3] The Final Report included evidence custody document (ECD) numbers for each kit.

5. DNA profiles were generated "from the known blood of [SrA CA] and [Appellee],"

6. The swabs collected from SrA CA contained semen,

7. DNA consistent with SrA CA and Appellee was found on the rectal swabs from SrA CA,

8. Unidentifiable male DNA was found on SrA CA's vaginal swab, and

9. DNA consistent with SrA CA and Appellee was found on Appellee's penile and scrotal swabs.

Mr. Davenport also testified to the likelihood that the recovered DNA profiles would match other individuals. On cross-examination, defense counsel clarified briefly that Mr. Davenport did not conduct the initial tests that produced the DNA profiles. Defense counsel successfully got Mr. Davenport to concede that the DNA analysis did not reveal anything about the nature of the sexual contact.

## II. CCA DECISION

The CCA's analysis focused on the relationship between Mr. Davenport's trial testimony and the Final Report, but did not directly address either the testimony on the motion in limine or the military judge's findings or conclusions on that motion. Katso, 73 M.J. at 637-40. The CCA held that the Final Report was testimonial, and determined that Mr. Davenport's trial testimony improperly repeated information from the report. Id.

at 638-40. Specifically, it held that Mr. Davenport repeated testimonial hearsay when he identified Appellee as the source of the DNA found on samples collected from SrA CA, acting as a "conduit" for this information. Id. at 639-40 (quoting Blazier II, 69 M.J. at 225). The CCA found as a matter of fact that "the record of trial does not definitively establish that Mr. Davenport had first-hand knowledge as to whom the known DNA sample or its corresponding profile belonged" and was "able to identify [Appellee] by name only by repeating the testimonial statement contained in Mr. Fisher's report that directly linked [Appellee] to the generated DNA profile." Id. at 638-39. Because the Government "failed to demonstrate that the DNA evidence played an insignificant role" in the case, the CCA was not convinced beyond a reasonable doubt that Mr. Davenport's presentation of the evidence was harmless. Id. at 641.

### III. DISCUSSION

The Sixth Amendment prohibits the admission of "testimonial statements of a witness who did not appear at trial," unless the witness is "unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 53-54 (2004). Whether evidence is testimonial hearsay is a question of law reviewed de novo. United States v. Tearman, 72 M.J. 54, 58 (C.A.A.F. 2013). We review the military judge's ruling on a motion to exclude

13

evidence for an abuse of discretion, "consider[ing] the evidence in the light most favorable to the prevailing party."[4] Reister, 44 M.J. at 413 (internal quotation marks omitted). Additionally, this Court will not overturn the CCA's factual findings unless they are clearly erroneous or unsupported by the record. United States v. Teffeau, 58 M.J. 62, 66-67 (C.A.A.F. 2003) (citing United States v. Tollinchi, 54 M.J. 80, 82 (C.A.A.F. 2000)).

## A.

"[T]he principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused." Crawford, 541 U.S. at 50. The Confrontation Clause thus protects defendants by excluding the introduction of "hearsay" that is "testimonial," the equivalent of an ex parte examination. Id. at 51. Relevant to this case, determining whether an expert witness's testimony has violated

---

[4] The CCA is required to apply the same deferential standard when reviewing a military judge's ruling on a motion to suppress. United States v. Kitts, 43 M.J. 23, 28 (C.A.A.F. 1995) (standard applies "on appeal" generally). However, by focusing its analysis on Mr. Davenport's trial testimony as it related to the Final Report, Katso, 73 M.J. at 637-40, the CCA did not give adequate deference to the military judge's findings of fact or consider the evidence supporting the ruling "in the light most favorable to the prevailing party." United States v. Reister, 44 M.J. 409, 413 (C.A.A.F. 1996) (internal quotation marks omitted).

the Confrontation Clause requires asking two questions: First, did the expert's testimony rely in some way on out-of-court statements that were themselves testimonial? Id. at 51-52. Second, if so, was the expert's testimony nonetheless admissible because he reached his own conclusions based on knowledge of the underlying data and facts, such that the expert himself, not the out-of-court declarant, was the "witness[] against [Appellee]" under the Sixth Amendment? U.S. Const. amend. VI; see Blazier II, 69 M.J. at 224-25; Crawford, 541 U.S. at 44. We turn to these two questions in order.[5]

B.

This Court has already delineated the boundary between testimonial and nontestimonial statements in detail. "[A] statement is testimonial if 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" United States v. Sweeney, 70 M.J. 296, 301 (C.A.A.F. 2011) (quoting United States v. Blazier (Blazier I), 68 M.J. 439, 442 (C.A.A.F. 2010)); see Crawford, 541 U.S. at 51-52; Tearman, 72 M.J. at 58.

---

[5] This case illustrates the gatekeeping role that military judges play, not only to ensure that expert testimony is reliable, but also to evaluate whether an expert's conclusions rely in part on testimonial hearsay, and, if so, whether the expert undertook sufficient independent analysis to render his own opinions as defined in Blazier II. 69 M.J. at 224-25; cf. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993).

In making this determination, this Court has asked whether it would "be reasonably foreseeable to an objective person that the purpose of any individual statement . . . is evidentiary," considering the formality of the statement as well as the knowledge of the declarant. Tearman, 72 M.J. at 58 (citation and internal quotation marks omitted); compare id., 72 M.J. at 59-61 (chain of custody documents and internal review worksheets were not testimonial, in part because an objective witness would reasonably believe that the documents were filled out for "internal control, not to create evidence" and because they "lack[ed] any indicia of formality or solemnity"), with Sweeney, 70 M.J. at 299, 304 (a signed memorandum reporting the results of a drug and a signed, "formal, affidavit-like" document certifying the integrity of the sample and compliance with protocol were testimonial), and Blazier I, 68 M.J. at 440, 443 (signed declarations served an "evidentiary purpose" because they "summarize[d] and clearly set forth [an] 'accusation,'" and were generated in response to a command request).

As detailed more fully below, many of the out-of-court data and "statements" relied upon by Mr. Davenport in reaching his conclusion were not testimonial. The case file -- containing the AFOSI documents, the computer-generated raw data, and Mr. Fisher's handwritten notes, including his documentation of the conditions of the samples upon arrival and quality control

16

measures -- is not in the record. However, Mr. Davenport's testimony makes clear that he reviewed all such documents. Nothing suggests that the AFOSI documents, which appear to primarily serve a chain of custody function, see supra note 1, were testimonial, or that the computer-generated raw data was either a statement or testimonial. See Tearman, 72 M.J. at 61; Sweeney, 70 M.J. at 305. Nor is there any indication that Mr. Fisher's notes or his other lab results that underlay the Final Report were signed, certified anything, bore indicia of formality, or that Mr. Fisher expected them to be used at trial.

Moreover, the CCA's "finding" that Mr. Davenport was "able to identify [Appellee] by name only by repeating the testimonial statement contained in Mr. Fisher's report that directly linked [Appellee] to the generated DNA profile," Katso, 73 M.J. at 639 (emphasis added), was clearly erroneous and is unsupported by the record. See Teffeau, 58 M.J. at 66-67; Kitts, 43 M.J. at 28; see also United States v. Piolunek, 74 M.J. 107, 110 n.3 (C.A.A.F. 2015). Rather, the record indicates that Mr. Davenport learned the names of the parties the same way Mr. Fisher did -- through the underlying data in the case file, including the forms submitted by AFOSI. See supra note 1. The Confrontation Clause does not require either Mr. Fisher or Mr. Davenport to personally shadow the evidence from its collection to USACIL in order to opine that it is what it purports to be

17

and was collected from the persons indicated on the forms. Furthermore, both Mr. Fisher and Mr. Davenport were in a position to testify as to whether lab procedures were followed in this regard.

In sum, Mr. Davenport's statements regarding proper testing, receipt, inventory, and analysis of the evidence, as well as his identification of the parties, relied on nontestimonial items in the case file.[6]  This testimony was therefore admissible.

The Final Report, which served as a consolidated and conclusory summary of Mr. Fisher's analysis, presents a more complicated problem, since, while it does not contain a formal certification, the record indicates that Mr. Fisher knew Appellee was a suspect in a sexual assault and that the Final Report would be "made official and sent to the agent in the case."  This problem is best resolved by assuming, arguendo, that the Final Report itself was testimonial, though based on evidence that was not testimonial, and that Mr. Davenport's testimony regarding the results of the serology exam and the DNA analysis may have relied in part on the Final Report (since he

---

[6] Moreover, Mr. Davenport relied on his own analysis of the data to rule out certain mistakes, such as contamination, that would produce unusual or illogical results.  For example, Mr. Davenport testified that had the swabs from the victim been contaminated with the known samples from Appellee, he would have noticed a male non-semen DNA profile on the swabs.

had to conduct the technical review of it) as well as the evidence that underlay it. From there, we proceed to the question whether, given those assumptions, Mr. Davenport's opinion was admissible despite its partial reliance on testimonial hearsay that was not itself introduced or repeated at trial.

### C.

To determine whether the portions of Mr. Davenport's testimony that may have been based in part on testimonial hearsay should have been admitted, we apply this Court's precedent, from Blazier I through Tearman. Under that line of cases, we ask whether Mr. Davenport had sufficient personal knowledge to reach an independent conclusion as to the object of his testimony and his expert opinion. Blazier II, 69 M.J. at 224-25. Framed another way, this Court queries whether Mr. Davenport was a "witness[] against" Appellee, the type of declarant Appellee had the constitutional right to cross-examine, or a mere "conduit" for another "witness[]," namely, Mr. Fisher. U.S. Const. amend. VI; Blazier II, 69 M.J. at 225; see Crawford, 541 U.S. at 44 (recounting Sir Walter Raleigh's demand that Lord Cobham, who had implicated Raleigh in a treason plot, be compelled to appear in person at trial to testify against him). We review Supreme Court precedent and undertake a

19

highly fact-specific inquiry to determine that Mr. Davenport was a "witness[]" rather than a "conduit."

i.

The Supreme Court has repeatedly applied the Confrontation Clause in the context of expert forensic analysis to determine whether evidence admitted at trial repeated testimonial hearsay, but it has not faced a situation identical to the one before us. Mr. Davenport, an expert with detailed knowledge of the results he presented, delivered testimony that does not easily fit into the Supreme Court's framework. However, reviewing those Confrontation Clause cases most directly related to the facts of this case convinces us that no Supreme Court precedent bars the application of the principles established in Blazier II or warrants concluding that Mr. Davenport's testimony simply repeated testimonial hearsay by an out-of-court declarant. We discuss each case in turn.

In Melendez-Diaz v. Massachusetts, 557 U.S. 305, 308, 329 (2009), the Supreme Court held that the petitioner's right to confrontation was violated when the prosecution submitted "certificates of analysis" into evidence without relying on the testimony of an expert witness. In Appellee's case, the Government did not introduce the Final Report. In Melendez-Diaz, the Supreme Court held that the analysts who prepared the certificates were "witnesses," 557 U.S. at 311 (internal

20

quotation marks omitted), who, through the certificates, made only a "bare-bones statement" and did not provide the petitioner the opportunity to learn about the tests performed or the analysts' ability to interpret those tests. Id. at 320. In this case, Mr. Davenport's testimony at trial and knowledge of the underlying facts provided Appellee ample opportunity to ascertain "what tests [Mr. Fisher] performed, whether those tests were routine," and whether Mr. Davenport had the requisite "judgment" and "skills" to interpret the results. See id.

In Bullcoming, 131 S. Ct. at 2711-12, the trial court allowed the state to introduce a certified report attesting to the petitioner's blood alcohol content through the testimony of an expert witness who had no knowledge about the analysis at all. The Supreme Court reversed, holding that the "surrogate testimony" of the expert, "who had neither observed nor reviewed [the] analysis," could not "convey what [the scientist] knew or observed about the events his certification concerned." Id. at 2712, 2715. Several concerns with the testimony led the Supreme Court to conclude that the expert had provided "surrogate" testimony: the expert could not describe "the particular test and testing process [the analyst] employed," id. at 2715; could not "expose any lapses or lies on the . . . analyst's part," id.; nor could he explain why the analyst "had been placed on unpaid leave." Id. Moreover, the State did not "assert

21

that . . . [the expert] had any independent opinion concerning [the results]." Id. at 2716 (internal quotation marks omitted).

Here, by contrast, no certified report was introduced; Mr. Davenport described, based on his personal knowledge, the tests and testing processes used, and the means for discerning protocol lapses. Unlike the analyst in Bullcoming, 131 S. Ct. at 2715, Mr. Fisher had not been placed on unpaid leave for unexplained reasons; rather, Mr. Fisher missed the trial in order to be with his ill mother, circumstances that indicate neither incompetence on Mr. Fisher's part nor a ploy by the Government to gain a tactical advantage. Mr. Davenport confirmed that he had formed and was testifying to his "independent opinion," providing opportunity for cross-examination. Moreover, Mr. Davenport's extensive review likely places this case well within Justice Sotomayor's hypothetical. See id. at 2722 (Sotomayor, J., concurring in part) (the testimony might have been admissible if the expert had some "degree of involvement" in the testing process, as when "the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the test at issue").

In Williams, 132 S. Ct. at 2230, the expert witness testified that she compared a DNA profile known to be from the petitioner to a DNA profile from a swab from the victim. The

scientist who generated the known profile also testified.  Id. at 2229.  However, the DNA profile from the victim's swab was produced by an outside laboratory, Cellmark, and nobody from Cellmark testified at trial.  Id.  The expert "trusted Cellmark to do reliable work because it was an accredited lab," but "had not seen any of the calibrations or work that Cellmark had done."  Id. at 2230.  The plurality decided that the testimony regarding the underlying report was not presented for the "truth of the matter asserted," but rather as a basis for the expert's opinion.  Id. at 2236-37, 2240.  Five Justices disagreed with this conclusion.  Id. at 2258-59 (Thomas, J., concurring in the judgment); id. at 2268-69 (Kagan, J., dissenting, in which Scalia, Ginsburg, and Sotomayor, JJ., joined).

In this case, Mr. Davenport saw all of the calibrations and work underlying the tests, and his close scrutiny and analysis of the results, comparison of the DNA profiles, and rerunning of the statistical analysis differed remarkably from the Williams expert's bald reliance on the Cellmark report, and seems to satisfy the concerns expressed by Justices Thomas and Kagan. See id. at 2258 (Thomas, J., concurring in the judgment) (explaining that the value of the expert's testimony "depended on the truth" of the out-of-court statement on which the expert relied); id. at 2270 (Kagan, J., dissenting, in which Scalia, Ginsburg, and Sotomayor, JJ., joined) ("[The expert] became just

23

like the surrogate witness in Bullcoming -- a person knowing nothing about 'the particular test and testing process,' but vouching for them regardless." (quoting Bullcoming, 131 S. Ct. at 2715)).  Whatever the differences between Williams and this case may be, the lack of majority support in Williams "for any point but the result" means that Williams does not alter "this Court's Confrontation Clause jurisprudence."  Tearman, 72 M.J. at 59 n.6 (dictum).

Thus, although the Supreme Court has not provided a workable majority rule that would resolve this case, the Court's precedent does not dictate the conclusion that Appellee lacked the opportunity to confront a witness against him.

ii.

In the absence of clear guidance from the Supreme Court, we are bound, within the constraints discernible from controlling precedent, to provide a clear rule for the military justice system.  Fortunately, we already have a rule.  This Court's precedent makes clear that even when an expert relies in part upon "statements" by an out-of-court declarant, the admissibility of the expert's opinion hinges on the degree of independent analysis the expert undertook in order to arrive at that opinion.  Blazier II, 69 M.J. at 224-25.

On the one hand, experts may not "act as a conduit for repeating testimonial hearsay," id. at 225, circumventing the

Sixth Amendment by acting as a "transmitter" instead of communicating an "independent judgment." Id. (quoting United States v. Ayala, 601 F.3d 256, 275 (4th Cir. 2010)). For this reason, the testimony of an expert witness who repeated statements in inadmissible cover memoranda violated the Confrontation Clause. Id. at 226. The witness should have "proffer[ed] a proper expert opinion based on machine-generated data and calibration charts, his knowledge, education, and experience and his review of the drug testing reports alone." Id.; see also Sweeney, 70 M.J. at 304 (an expert's testimony that a document "showed the presence of cocaine and codeine" was erroneously admitted). On the other hand, "[a]n expert witness need not necessarily have personally performed a forensic test in order to review and interpret the results and data of that test." Blazier II, 69 M.J. at 224-25; cf. M.R.E. 703 ("[F]acts or data . . . upon which an expert bases an opinion . . . . need not be admissible."). Experts may "review and rely upon the work of others, including laboratory testing conducted by others, so long as they reach their own opinions in conformance with evidentiary rules regarding expert opinions." Blazier II, 69 M.J. at 224. That is precisely what happened here.

This rule is not inconsistent with Williams or the precedent applied by the Williams plurality or dissenters. See supra Part III.C.i. Moreover, as Justice Kagan noted in her

25

dissent, the "clear rule" established in prior cases is "clear no longer," since "[t]he five Justices who control[led] the outcome of [Williams] agree[d] on very little," and "left significant confusion in their wake." Williams, 132 S. Ct. at 2277 (Kagan, J., dissenting, in which Scalia, Ginsburg, and Sotomayor, JJ., joined). Nonetheless, two things are clear: first, none of the decisions of the Supreme Court have purported to jettison expert testimony in toto; and, second, neither have they suggested that each individual who touched the evidence or was involved in its analysis must testify.

And, since Williams, other courts have also focused on the extent to which an expert formed an independent opinion to determine whether the testimony was permissible in light of Crawford, as we did in Blazier II. See, e.g., United States v. Vera, 770 F.3d 1232, 1239-40 (9th Cir. 2014) (an expert's opinion regarding a gang's control over narcotics trafficking was admissible because the combination of the expert's knowledge, even if gleaned from testimonial statements, and his own observations turned his opinion into "an original product that could have been tested through cross-examination" (internal quotation marks omitted)); Leger v. State, 732 S.E.2d 53, 60 (Ga. 2012) (a laboratory supervisor's testimony was admissible because her involvement in the testing gave her a "significant personal connection to the test"); State v. Roach, 95 A.3d 683,

688, 697 (N.J. 2014) (an expert was permitted to testify regarding the comparison between a DNA profile she generated and a profile generated by another analyst because she "used her scientific expertise and knowledge to independently review and analyze" the analyst's data, and "satisf[ied] herself of the reliability of the results"); State v. Lopez, 45 A.3d 1, 13-14 (R.I. 2012) (an expert's opinion was admissible because he was "integrally involved" in the testing process, formulating his own conclusions rather than "act[ing] as a conduit of the opinions of, or parrot[ing] the data produced by, other[s]").[7]

---

[7] See also Hingle v. State, 153 So.3d 659, 664-65 (Miss. 2014) (the testimony of a witness who reviewed the testing analyst's report was admissible because the reviewer had "intimate knowledge" of the testing, and reached an "independent conclusion"); State v. Ortiz-Zape, 743 S.E.2d 156, 161 (N.C. 2013) (an expert can provide testimony that relies on out-of-court statements so long as the expert does not "merely repeat[] out-of-court statements"). Some courts eschew this rule, however, and find a Confrontation Clause violation even if the expert had a high degree of involvement in the testing process or thoughtfully formulated her own conclusions. See, e.g., United States v. Turner, 709 F.3d 1187, 1188-89, 1193 (7th Cir. 2013) (a supervisor who reviewed an analyst's notes, data, and report violated the Confrontation Clause when she testified to the analyst's procedures and conclusions, although the error was harmless beyond a reasonable doubt); Martin v. State, 60 A.3d 1100, 1101, 1108 (Del. 2013) (the testimony of a laboratory manager with knowledge of lab procedures who reviewed an analyst's test results and prepared her own report violated the Confrontation Clause because the manager relied on the analyst's representations in reaching her conclusions); Jenkins v. United States, 75 A.3d 174, 189-90 (D.C. 2013) (a supervisor who assessed whether two DNA profiles matched based on his review of the work of biologists and technicians in his lab "relayed hearsay" when he repeated some of his subordinates' observations

iii.

Even if Mr. Davenport's in-court statements that semen or DNA were found on the evidentiary swabs and that certain DNA samples matched each other were based in part on the Final Report, they were admissible. Mr. Davenport performed an extensive independent review of the case file, upon which the Final Report was based, during which he determined that Mr. Fisher took the prescribed quality control measures, that no accidents occurred, and that the results were logically consistent. He compared the ECD numbers on the Final Report to the numeric identifiers found elsewhere in the case file to check that Mr. Fisher had analyzed the correct samples. He reanalyzed the DNA profile data that Mr. Fisher generated to verify the matches that Mr. Fisher reported and recalculated the frequency statistics. This extensive review process, explored in full before the military judge during the hearing on the motion in limine, allowed Mr. Davenport to "satisfy [him]self of the reliability of the results." See Roach, 95 A.3d at 697. In sum, Mr. Davenport presented his own expert opinion at trial, which he formed as a result of his independent review, and clearly conveyed the basis for his conclusions during the hearing on the motion in limine.

and conclusions, including the conclusion that the evidence contained the appellant's DNA).

28

That Mr. Davenport did not himself perform aspects of the tests "goes to the weight, rather than to the admissibility" of his opinion. Blazier II, 69 M.J. at 225. And given defense counsel's limited cross-examination of Mr. Davenport at trial, we decline to assume that they believed that there were grounds to attack the tests he did not personally perform.

D.

We conclude that this case does not implicate the concern described in Crawford, as Appellee was not deprived of the opportunity to question and confront an opposing witness. 541 U.S. at 50-51. Mr. Davenport's conclusions regarding the presence of semen and identification of DNA were his own. Even if those conclusions may have derived in part from the Final Report, Mr. Davenport's reliance on other, nontestimonial factual bases -- which also served as the foundation for the Final Report -- allowed him to render his own opinion. The witness against Appellee was not Mr. Fisher or the Final Report, but Mr. Davenport, who appeared in person at trial. Appellee had the opportunity to cross-examine Mr. Davenport about his review of the case file and his expert opinion, and, generally, to "subject [the testimony] to adversarial testing." Id. at 43.

Having thus parsed Mr. Davenport's testimony, we conclude that it was admissible. Therefore, the military judge did not abuse his discretion in denying Appellee's motion in limine, nor

29

did Mr. Davenport's trial testimony violate Appellee's right to confrontation.

## IV. DECISION

The decision of the United States Air Force Court of Criminal Appeals is reversed.[8]  The record is returned to the Judge Advocate General of the Air Force for remand to the CCA for further proceedings under Article 66, UCMJ, 10 U.S.C. § 866 (2012).

---

[8] Appellee's motion to attach is denied, and Appellee's motion for appropriate relief in the nature of directing specific action upon a remand to the lower court is denied without prejudice to his right to request such relief from that court. Appellant's motion to supplement the record is also denied without prejudice.

United States v. Katso, No. 14-5008/AF

OHLSON, Judge (dissenting):

To be clear, I do not disagree with much of the analysis and many of the conclusions contained in the majority opinion. Rather, I diverge from the majority's view of this case in regard to just one point -- but it is a point which I believe proves fatal to the Government's position. Specifically, I believe Appellee had a Sixth Amendment right to confront the initial laboratory technician, Mr. Fisher, regarding whether he precisely followed the required protocols for preparing the DNA samples, and thus whether he may have contaminated the evidentiary DNA sample with the known DNA sample. Because Appellee was not afforded this opportunity, and because I find an insufficient basis to conclude that the Government has met its burden of demonstrating that this constitutional error was harmless beyond a reasonable doubt, I conclude that Appellee's conviction must be reversed. Accordingly, I respectfully dissent.

It would be an understatement, indeed, to say that the Supreme Court's decision in Williams v. Illinois, 132 S. Ct. 2221 (2012), where no single line of reasoning garnered a majority of the justices' votes, has muddled the boundaries of an accused's Sixth Amendment right "to be confronted with the witnesses against him." U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be

confronted with the witnesses against him . . . ."). This is particularly true in those instances where, as here, forensic results are a central point at trial, and questions arise pursuant to the Confrontation Clause regarding who must testify about the tests that were performed, the procedures that were followed, and the results that were obtained. Indeed, the confusion that Williams has sown seems to have consigned appellate courts such as ours to now view the issues that arise in these types of Confrontation Clause cases as "through a glass, darkly." Nevertheless, I conclude that by analyzing other applicable precedents of the Supreme Court, as well as the jurisprudence of our own Court, answers to these questions may ultimately be discerned.

The majority does a thorough job of reciting the facts in this case, and therefore I will not repeat them in toto. Instead, I merely note the following points which I view as essential to the proper understanding and analysis of the issue before us.

First, Mr. Fisher handled and prepared for testing both the material that contained the evidentiary DNA samples and the material that contained the known DNA samples. As a result, there was a potential for contamination of the two samples. This potential was significantly increased if Mr. Fisher did not precisely follow the laboratory's protocol when handling and

preparing the samples, and such contamination would render meaningless any subsequent analysis.

Second, although Mr. Davenport compared the data from the two DNA samples that previously had been prepared by Mr. Fisher, he did not handle the original evidence that was submitted to the laboratory and did not independently prepare his own DNA samples for testing. Moreover, Mr. Davenport did not observe Mr. Fisher's handling of the original evidence, nor did he observe Mr. Fisher's preparation of these samples. Accordingly, Mr. Davenport's "verification" that Mr. Fisher followed the required protocol consisted of reviewing Mr. Fisher's written statements in the file in which Mr. Fisher asserted that he had done so.

Third, in motions practice, Appellee not only sought to require Mr. Fisher's testimony at the court-martial, he also specifically cited as a basis for this demand his concern about potential contamination of the DNA samples. Appellee presumably wanted to question Mr. Fisher about the precise steps he took in preparing the samples, as well as to probe the credibility and reliability of this witness. As Justice Kagan noted in her dissenting opinion in Williams: "[A] defendant may wish to ask the analyst a variety of questions: How much experience do you have? Have you ever made mistakes in the past? Did you test the right sample? Use the right procedures? Contaminate the

sample in any way?" 132 S. Ct. at 2275 (Kagan, J., dissenting, in which Scalia, Ginsburg, and Sotomayor, JJ., joined).

Fourth, despite Appellee's articulation of his concern about contamination, the military judge denied Appellee the opportunity to confront Mr. Fisher at trial, essentially ruling that Mr. Davenport was an adequate substitute for Mr. Fisher and that his appearance satisfied the requirements of the Confrontation Clause.

Fifth, when Mr. Davenport appeared before the court-martial, he did not testify that _if_ Mr. Fisher followed all of the required protocols and _if_ Mr. Fisher did not commit any errors or mistakes, _then_, in his opinion, the DNA samples were properly handled and prepared and the results of the testing could be relied upon. Rather, Mr. Davenport merely assumed, without saying so, that Mr. Fisher's written assertion in the file that he had not committed any mistakes or errors was true, and then testified before the panel members that the proper protocols were followed and that his own independent examination of the computer files relating to the samples prepared by Mr. Fisher demonstrated that the evidentiary sample matched the known sample.

In turning to my analysis of these facts and the applicable law, I first must emphasize that I do not contest the proposition that an appropriately credentialed individual may

give expert testimony regarding data produced by another laboratory technician.  United States v. Blazier (Blazier II), 69 M.J. 218, 222 (C.A.A.F. 2010) ("[A]n expert may, consistent with the Confrontation Clause and the rules of evidence, (1) rely on, repeat, or interpret admissible and nonhearsay machine-generated printouts of machine-generated data, and/or (2) rely on, but not repeat, testimonial hearsay that is otherwise an appropriate basis for an expert opinion, so long as the expert opinion arrived at is the expert's own." (citations omitted)).  Further, I do not seek to suggest that every individual who touches DNA evidence as it progresses from the crime scene to the courthouse must testify at trial.  See Melendez-Diaz v. Massachusetts, 557 U.S. 305, 311 n.1 (2009).  Not at all.

On the other hand, however, I also note that it is a simple fact that "[f]orensic evidence is not uniquely immune from the risk of manipulation [and mistake]."  Id. at 318.  Therefore, a defendant's right to confront and cross-examine laboratory technicians regarding the steps they took in developing this forensic evidence may not be summarily curtailed merely because science and statistics are involved.  To the contrary, an accused has the right to ask "questions designed to reveal whether [a lab analyst's] incompetence . . . or dishonesty" tainted the forensic results.  Bullcoming v. New Mexico, 131 S.

Ct. 2705, 2715 (2011). In the instant case, Appellee was not afforded that right.

Mr. Davenport was an expert on, among other issues, what the laboratory protocols were in a case such as this one. However, he was not an expert on the issue of whether Mr. Fisher unerringly followed those protocols. Accordingly, Mr. Davenport could use his expertise to examine and testify about such issues as the efficacy of the laboratory protocols, whether there were irregularities between the samples that were tested, whether the two samples matched one another, and the statistical likelihood that Appellee was the source of the evidentiary DNA. However, despite his expertise on these issues, in determining whether Mr. Fisher actually followed the protocols that were required of laboratory technicians, the underlying facts in this case show that Mr. Davenport relied on Mr. Fisher's out-of-court written assurances that he had done so. This was testimonial hearsay. See Bullcoming, 131 S. Ct. at 2715 (stating that surrogate could not expose any lapses or lies on the certifying analyst's part).

In analyzing this concern, I first note that Mr. Fisher's routine written assurances in the file that he properly performed all the required procedures and did not commit any mistakes or errors did not carry with them any particular indicia of reliability. But more importantly, I further note that "'reliability' is no substitute for [the] right of

6

confrontation." Blazier II, 69 M.J. at 223. As the Supreme Court explained in Crawford v. Washington, "Where testimonial statements are involved, . . . . [the Confrontation Clause] commands, not that evidence be reliable, but that reliability be assessed in a particular manner:  by testing in the crucible of cross-examination."  541 U.S. 36, 61 (2004).

Second, as pointed out by the majority, I acknowledge that these written assurances, along with Mr. Fisher's other notes, the test results, and the written report, were not admitted into evidence, and therefore this case does not squarely present the type of Confrontation Clause issues that the Supreme Court addressed in Bullcoming and Melendez-Diaz.  Nevertheless, in my view, Mr. Davenport effectively repeated the out-of-court statements made by Mr. Fisher when he testified that Mr. Fisher had followed standard procedures in preparing the DNA samples -- a putative fact about which Mr. Davenport had no independent knowledge.  Moreover, when the military judge denied Appellee's request to have Mr. Fisher testify, the military judge effectively rendered impervious to cross-examination and attack the issue of whether Mr. Fisher contaminated the evidentiary sample.  See Bullcoming, 131 S. Ct. at 2715 n.7.  (an accused has a right to question a laboratory technician about his "proficiency, the care he took in performing his work, and his veracity").

Accordingly, I conclude that Justice Kagan's dissenting opinion in Williams, which managed to garner the votes of four justices despite the highly fractured nature of the Court, neatly and succinctly captures the essence of what I believe to be still-controlling precedent in regard to the required analysis of cases such as the one before us:

> Under our Confrontation Clause precedents, this is an open-and-shut case. The State of Illinois prosecuted Sandy Williams for rape based in part on a DNA profile created in Cellmark's laboratory. Yet the State did not give Williams a chance to question the analyst who produced that evidence. Instead, the prosecution introduced the results of Cellmark's testing through an expert witness who had no idea how they were generated. That approach -- no less (perhaps more) than the confrontation-free methods of presenting forensic evidence we have formerly banned -- deprived Williams of his Sixth Amendment right to "confron[t] . . . the witnesses against him."

Williams, 132 S. Ct. at 2265 (Kagan, J., dissenting, in which Scalia, Ginsburg, and Sotomayor, JJ., joined) (alteration in original).

Moreover, I note that there are aspects of the instant case that differ from the facts in the Williams case and, in my view, these differences serve to make the Confrontation Clause problem more acute here. First, in Williams the plurality seemed to place significant emphasis on the fact that the purpose of the laboratory DNA profile was not "to create evidence for use at trial." Id. at 2243. Justice Alito noted that at the time Cellmark analyzed the DNA sample, no one had been identified as

8

the possible perpetrator of the offense and it was unclear that anyone would ever be arrested.  Id. at 2243-44.  Not so here. Mr. Fisher knew from the outset that an accused had been identified, and thus he knew that when he wrote his notes and conducted his tests, he likely was "creat[ing] evidence for use at trial."  Id. at 2245.  This fact places Mr. Fisher's statements "squarely within the heartland of Confrontation Clause jurisprudence."  United States v. Turner, 709 F.3d 1187, 1193 (7th Cir. 2013).

Second, this was a court-martial with panel members rather than a military judge-alone trial.  By the plurality's own reckoning in Williams, this increased the chances that the trier of fact relied on the out-of-court statements implicit in Mr. Davenport's testimony for their truth.  See Williams, 132 S. Ct. at 2236 ("The dissent's argument would have force if petitioner had elected to have a jury trial.").

Although the Government elicited testimonial hearsay from Mr. Davenport, this does not end my Confrontation Clause inquiry.  I next turn my attention to the Supreme Court's decision in Crawford where, as the majority notes, the Court held that a prosecutor's use of testimonial hearsay violates the Confrontation Clause -- unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant.  541 U.S. at 59.  I concede that this provides a

9

significant exception to the Confrontation Clause in particular instances. However, I do not believe that the holding in Crawford is applicable to the instant case because I am not convinced that the record of trial supports the military judge's finding that Mr. Fisher was unavailable to testify.

First, the military judge noted that based on communications with counsel, Mr. Fisher himself estimated that he would be available for witness interviews on "approximately Tuesday, 3 May 2011." Because Appellee's court-martial began on May 3, 2011, and continued through May 6, 2011, Mr. Fisher's own estimation of his schedule made him available for questioning. Further, the military judge found as fact that Mr. Fisher would be "unable to travel to testify at the court-martial until 5 May 11 at the earliest." Because the record reflects that Mr. Davenport, Mr. Fisher's substitute, was not called to testify in this case until the evening of May 5, the military judge's own findings indicate that Mr. Fisher likely was available to testify. Accordingly, I conclude that there was a Confrontation Clause violation under Crawford because Mr. Fisher should not have been considered unavailable to testify at Appellee's trial.

And finally, I find that the DNA evidence was a central and integral element of the Government's case against Appellee, and that the Government was unable to demonstrate that the constitutional error pertaining to that evidence was harmless

beyond a reasonable doubt.  Stated differently, I find that

"'there is a reasonable possibility that the evidence complained

of might have contributed to the conviction.'"  Chapman v.

California, 386 U.S. 18, 23 (1967) (quoting Fahy v. Connecticut,

375 U.S. 85, 86-87 (1963)).  Accordingly, I conclude that

Appellee's conviction must be reversed, and I respectfully

dissent.