# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

### v.

## Master Sergeant JOSEPH R. DOCKERY III
## United States Air Force

## ACM 38624

## 2 December 2015

Sentence adjudged 1 March 2014 by GCM convened at Osan Air Base, Republic of Korea. Military Judge: William C. Muldoon, Jr. (arraignment) and Gregory O. Friedland.

Approved Sentence: Confinement for 1 year and reduction to E-4.

Appellate Counsel for Appellant: Captain Lauren A. Shure.

Appellate Counsel for the United States: Major Mary Ellen Payne and Gerald R. Bruce, Esquire.

Before

HECKER, DUBRISKE, and BROWN
Appellate Military Judges

OPINION OF THE COURT

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.

DUBRISKE, Judge:

Contrary to his pleas at a general court-martial, Appellant was convicted by a panel of officer and enlisted members of sexual assault and adultery,[1] in violation of Articles 120 and 134, UCMJ, 10 U.S.C. §§ 920, 934. Appellant, who at the time of trial was less than two months away from retirement eligibility, was sentenced to one year of

---

[1] Although we question the prosecutorial judgment in charging adultery in conjunction with an instance of sexual assault, we find the evidence is legally and factually sufficient to sustain the conviction in this particular case. Article 66(c), UCMJ, 10 U.S.C. § 866(c).

confinement and a reduction to the rank of senior airman. The convening authority approved the sentence as adjudged.

On appeal, Appellant alleges six assignments of error which are discussed in detail below. None of the allegations of error merit relief.

*Background*

The charged offenses in this case surround Appellant's sexual activity with a government civilian employee, Ms. AR, while she was on temporary duty to Osan Air Base, Republic of Korea. At the time of the offense, Appellant was married and was stationed at Osan Air Base for a one-year, unaccompanied assignment.

Appellant had been Ms. AR's direct supervisor approximately 10 years earlier when Ms. AR was on active duty. Appellant's relationship with Ms. AR during her active duty service was described as "entirely professional" by Ms. AR. Ms. AR viewed Appellant as one of her most valued mentors from her active duty service.

At some point during Ms. AR's temporary duty assignment at Osan Air Force Base, she ran into Appellant while getting lunch. She and Appellant discussed some changes in their personal lives during this lunch and agreed they should get together before Ms. AR returned to the United States to better catch up with each other.

Two days prior to returning home, Ms. AR went to a base restaurant with other members of her stateside unit. Over approximately four hours, Ms. AR remembered drinking three mixed drinks and three shots of hard liquor. The third shot was Ms. AR's last memory of the evening. The next thing she remembered was waking up in the emergency room early the next morning.

Based on other evidence adduced at trial, after she left the restaurant and was taken by friends to her billeting room, Ms. AR contacted Appellant and asked him to pick her up. Appellant agreed and met Ms. AR in the lobby of the billeting office. After spending time in the lobby talking, including discussions with one of Ms. AR's co-workers, Appellant and Ms. AR left the lobby around 2300 hours and walked to Appellant's dormitory room, which is where the sexual activity charged in this case took place.

Around midnight, Appellant's neighbor in the dormitory, Master Sergeant (MSgt) AB, heard a female voice crying. He assumed it was someone talking on a cell phone, so he attempted to go back to sleep. After the crying continued for about 15 minutes, MSgt AB contacted Security Forces to report the continued noise. MSgt AB then stepped out in the hallway and he and another dormitory resident determined the sound was coming from Appellant's room.

The two then knocked on Appellant's door. When Appellant answered the door, he was asked if the female in his room was all right. Appellant stated that she was fine. Appellant was then told by MSgt AB that law enforcement would soon be responding to his dormitory room.

The responding officers made contact with Appellant, who informed them everything was fine. The officers advised Appellant they needed to speak with his female friend to make sure she was not in distress. Shortly thereafter, Ms. AR came to the doorway fully nude. Ms. AR declined to put on her clothing and eventually stepped out into the dormitory hallway. Ms. AR was emotionally upset and appeared intoxicated, displaying slurred speech, incoherent responses to questioning, and lack of balance. Ms. AR was unable to dress herself, so the responding officers assisted her in putting on some of her clothing before transferring her to a hospital for evaluation.

When asked about Ms. AR's intoxicated condition, Appellant informed one of the responding officers that she was "like this" when he picked her up. The responding officer interpreted Appellant's statement to mean Ms. AR was already intoxicated when he met her at the lodging office earlier in the evening.

Additional facts necessary to resolve Appellant's assignments of error are provided below.

*Government Challenge for Cause*

It was discovered prior to the start of voir dire that one of the enlisted members selected for service by the convening authority was a potential defense witness. With the concurrence of the parties, the military judge questioned the proposed court member regarding his relationship with Appellant and his knowledge about the facts of the case.

The court member confirmed his relationship with Appellant, which resulted in the military judge dismissing the member for cause. Prior to his release, the court member, who apparently was African-American, confirmed for the court that he had not said anything to the other 11 members about his knowledge of Appellant's case. To ensure the court member did not have any additional contact with the remaining members, the military judge instructed him to wait until the remaining members had entered the courtroom before going to the deliberation room to collect his personal belongings. The rest of the panel was then informed that the member had been excused by the military judge.

During individual voir dire of the remaining 11 members, trial defense counsel posed the same two questions. The first question, given Appellant was African-American and Ms. AR was white, asked whether the members had any strong feelings or concerns

about interracial relationships or interracial sex. All 11 members answered in the negative.

Trial defense counsel then individually asked each member if they would want someone like themselves sitting on the panel if they were facing trial like Appellant. When trial defense counsel asked why they felt this way, 10 of the 11 members responded in a typical manner, discussing their fairness, open-mindedness, and ability to follow the judge's instructions. In contrast, the remaining member, MSgt LW, who advised she was both African-American and Hispanic, engaged in the following discussion with counsel regarding why she would want herself sitting on the panel if she was in Appellant's position.

> [MSgt LW:] I would think yes, be fair, not from nothing, but for some reason an African American person already got dismissed, so really I would think—not that it wouldn't be—oh god—I would say yes. You would want—you would want somebody like me to be fair for both parties, to judge. I will think that I will be fair, listening to all the facts, either way.
>
> [DC:] . . . [A]ny other things in terms of you thinking you'd be a good fit for the panel, you would want somebody like you if you were in that position? Anything else beyond what you've already said?
>
> [MSgt LW:] If I was in a position of—
>
> [DC:] Yeah, if—would you want somebody like you on a jury if you were in that position? You discussed your ability to be fair. I was just curious if there was anything else.
>
> [MSgt LW:] No, sir. I think I'll be fair.
>
> [DC:] Okay, all right, thank you so much.
>
> [MSgt LW:] No problem.
>
> [MJ:] Trial Counsel, any follow up questions?
>
> [TC:] Briefly, Your Honor. [MSgt LW], I just wanted to clarify one thing that you just said. You made a comment, I believe—maybe I heard it incorrectly—you made a comment when he asked you about whether or not you could be fair, you made a comment about one person had already gotten

dismissed, or one African American already got dismissed. Is that what you stated?

[MSgt LW:] Yes, sir.

[TC:] What were you—what was your point, or what—are you concerned that he was dismissed and that he's African American?

[MSgt LW:] No, sir, no. Just if—well, I don't know—I'm assuming there's supposed to be 12 individuals, and I was just wondering if—you know—if he was going to be replaced.

Trial counsel then asked the military judge if he wanted to instruct MSgt LW on the composition of the panel in military criminal cases. After doing so, including instructing MSgt LW that she should not speculate on why any member is released, the military judge confirmed with MSgt LW that she could be fair to both sides. Trial and defense counsel requested no additional follow up to the judge's inquiry.

In later challenging MSgt LW for cause, trial counsel provided the following justification for his request:

Yes, sir. It was the comment she made about—that seemed like she didn't really intend for it to slip out, but she seemed to believe that—she expressed basically the fact that she kind of felt like she needed to protect the accused, or kind of battle for him because we'd already excused one black member. It seemed to indicate that she had a bias in his favor along racial lines. Not—no malicious intent there, but it seemed to express a bias and a belief that there might be some sort of conspiracy on the part of the government to get rid of minority members on the panel. So the government can't be comfortable that she is not biased in favor of the accused and against us because of that statement, despite the fact that obviously I know you clarified and gave her a lot more background about that challenge—or that excusal I guess I should say. Still, the fact that that's what she expressed, and then she seemed to want to backtrack from that when she realized what she said. That's our basis for challenging her for actual bias.

The defense counsel opposed the challenge, arguing MSgt LW had simply been confused about the size of a military panel, had not indicated any racial bias or a desire to

protect Appellant based on her race, and had ultimately indicated she would be fair. The military judge made the following findings in granting the challenge for cause:

> All right, I've considered her responses. While I don't find an actual bias, on the part—I think that was cleared up by my instructions to her, I do find that there is implied bias on the part of [MSgt LW] from her utterance without any precipitating factors there, and so given that I find implied bias, the challenge against [MSgt LW] is granted. So she will be excused.

Appellant now contends the military judge erred in granting the challenge for cause, arguing MSgt LW's removal from the case was related to her race and thus violated the Equal Protection Clause,[2] the Supreme Court's holding in *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), and MSgt LW's civil right to participate as a panel member.

Rule for Courts-Martial (R.C.M.) 912(f)(1)(N) provides that a member shall be excused for cause whenever it appears that the member "[s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." "This rule encompasses challenges based upon both actual and implied bias." *United States v. Elfayoumi*, 66 M.J. 354, 356 (C.A.A.F. 2008) (citing *United States v. Clay*, 64 M.J. 274, 276 (C.A.A.F. 2007)).

We review issues of implied bias "under a standard less deferential than abuse of discretion but more deferential than de novo." *United States v. Downing*, 56 M.J. 419, 422 (C.A.A.F. 2002). Implied bias is "viewed through the eyes of the public, focusing on the appearance of fairness." *United States v. Bagstad*, 68 M.J. 460, 462 (C.A.A.F. 2010) (quoting *Clay*, 64 M.J. at 276) (internal quotation marks omitted). As such, appellate courts employ an objective standard when reviewing a military judge's decision regarding implied bias. *United States v. Strand*, 59 M.J. 455, 458 (C.A.A.F. 2004). The test for implied bias, considers, "among other distinct military factors, the confidence appellate courts have that military members will follow the instructions of the military judges and thus, while it will often be possible to 'rehabilitate' a member on a possible question of actual bias, questions regarding the appearance of fairness may nonetheless remain." *United States v. Woods*, 74 M.J. 238, 243 (C.A.A.F. 2015). In assessing implied bias claims, the totality of the circumstances should be considered. *United States v. Peters*, 74 M.J. 31, 34 (C.A.A.F. 2015).

"As a matter of due process, an accused has a constitutional right, as well as a regulatory right, to a fair and impartial panel." *Downing*, 56 M.J. at 421 (quoting *United*

---

[2] U.S. CONST. amend. XIV, § 1.

*States v. Wiesen*, 56 M.J. 172, 174 (2001)).  The United States Supreme Court has long recognized that an African-American defendant is denied equal protection of law when put on trial before a jury in which members of his race have been purposely excluded. *Strauder v. West Virginia*, 100 U.S. 303 (1880).  This constitutional denial of due process includes instances when the exclusion is based on the false assumption that members of a certain race as a group are not qualified to serve as jurors, or will be unable to impartially consider a case against a defendant of a similar race.  *See Neal v. Delaware*, 103 U.S. 370, 397 (1881); *Batson*, 476 U.S. at 89.  "Discrimination in the jury selection process undermines our criminal justice system and poisons public confidence in the evenhanded administration of justice."  *Davis v. Ayala*, 135 S. Ct. 2187, 2208 (2015).

This case, however, is different from most race-focused jury composition cases in that here we are dealing with a challenge for cause, and not the convening authority's discriminatory selection or a prosecutor's use of a preemptory challenge.[3]  *See United States v. Elliott*, 89 F.3d 1360, 1364–65 (8th Cir. 1996) (holding the *Batson* challenge framework applies only to peremptory strikes).  When viewed through the aperture of a for-cause challenge, it is recognized that a racial bias possessed by a juror can be a legitimate ground for removal.  *See Powers v. Ohio*, 499 U.S. 400, 411 (1991) (individual jurors predisposed to favor a defendant could be excused for cause); *cf. Batson*, 476 U.S. at 123 (Burger, C.J., dissenting) ("To suggest that a particular race is unfit to judge in any case necessarily is racially insulting.  To suggest that each race may have its own special concerns, or even may tend to favor its own, is not.").  Appellant, in his reply brief, acknowledges a member could be struck for cause when displaying a racial bias.  Appellant, however, argues the court member's statements here did not establish she possessed a bias towards Appellant due to race.

After reviewing the court member's responses and considering the military judge's limited factual findings, we do not believe the military judge erred in granting the Government's challenge for cause in this case.  While we agree it would be constitutionally impermissible for a prosecutor to a remove a juror based only on an assumption the juror was predisposed to favor a defendant because of race, *United States v. Tulloch*, 47 M.J. 283, 286 (C.A.A.F. 1997), that is not the case before us.  Here, the individual juror injected the issue of race sua sponte.

Applying the required objective standard to the circumstances in this case, we believe a reasonable member of the public could find MSgt LW's unsolicited response about the removal of another panel member raised the issue of racial bias and called into

---

[3] Although one might imagine a scenario where a challenge for cause masquerades as a deliberate and intentional decision to purposefully exclude a particular race, this is not such a case.  In such a scenario, it would be critical for counsel to clearly raise this issue on the record to allow for thorough review by the trial judge and, if necessary, the appellate court.  *Cf. McCrory v. Henderson*, 82 F.3d 1243, 1247–48 (2d Cir. 1996) (discussing "problems caused by tardy *Batson* challenges" and why they mandate waiver of the issue if not raised during jury selection).  Here, trial defense counsel did not assert the for-cause challenge was a ruse to purposefully exclude a particular race.

question the fairness of the trial if MSgt LW remained part of the court-martial panel. *See Woods*, 74 M.J. at 244. While we acknowledge Appellant's alternative assertion that MSgt LW's initial response may have been motivated solely by her interest in racial diversity, her ambiguous reply to trial counsel's attempt to clarify her position further buttresses a theory supporting the finding of implied bias. Considering the totality of the discussions with MSgt LW, we are hesitant to question the military judge's ruling in this case. *Cf. United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000) (noting that rulings on challenges for cause are made on the spot and under pressure); *id.* at 318 (Scalia, J., concurring) ("The resolution of juror-bias questions is never clear cut . . . .").

Even assuming the military judge erred, we believe any error was harmless beyond a reasonable doubt. In so holding, we recognize purposeful discrimination in the selection of jurors has been viewed as a structural error not subject to harmless error review. *See generally Batson*, 476 U.S. 86–87 (discrimination on the basis of race in the selection of petit jurors); *Vasquez v. Hillery*, 474 U.S. 254, 261–62 (1986) (discrimination on the basis of race in the selection of grand jurors). We do not believe the granting of a government's challenge for cause arises to structural error. *Cf. Estrada v. Scribner*, 512 F.3d 1227, 1240 (9th Cir. 2008) ("[T]he *presence* of a biased juror is structural error not subject to harmless error analysis. . . .") (emphasis added).

"Structural errors are those constitutional errors so affecting the framework within which the trial proceeds, that the trial cannot reliably serve its function as a vehicle for determination of guilt or innocence." *United States v. McMurrin*, 70 M.J. 15, 19 (C.A.A.F. 2011) (internal citation and quotation marks omitted). However, most constitutional mistakes call for reversal only if the government cannot demonstrate harmlessness. *Neder* v. *United States*, 527 U.S. 1, 8 (1999). "[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis." *Rose v. Clark*, 478 U.S. 570, 579 (1986).

In the case sub judice, we believe any error surrounding the challenge for cause was non-structural and can be tested for prejudice. In doing so, we note Appellant raised no complaint that the members who actually heard his case were unqualified to serve. This is a critical prerequisite, we believe, as previously noted by our superior court:

> We do not subscribe to the myth of the numbers game. There is no reason to suspect that a different mix of members would have produced results more favorable to appellant. The record establishes that the members were thoroughly qualified and suited to sit in judgment of appellant.

*United States v. Newson*, 29 M.J. 17, 21 (C.M.A. 1989).[4]  As we have no evidence a different panel would have somehow produced a better result for Appellant, we likewise find Appellant suffered no material prejudice.  *See Ross v. Oklahoma*, 487 U.S. 81, 86–88 (1988).

### *Effectiveness of Counsel*

Appellant next alleges his counsel were ineffective because they failed to object to a question posed to Ms. AR about whether Appellant was the person who sexually assaulted her.  Appellant argues the question was objectionable due to Ms. AR's lack of memory regarding the sexual activity.  Alternatively, Appellant contends the question was improper as her conclusion that Appellant had sexually assaulted her was the sole province of the finder of fact.

We review claims of ineffective assistance of counsel de novo.  *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009).  When reviewing such claims, we follow the two-part test outlined by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  *See United States v. Tippit*, 65 M.J. 69, 76 (C.A.A.F. 2007).  Our superior court has applied this standard to military courts-martial, noting that "[i]n order to prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice."  *United States v. Green*, 68 M.J. 360, 361 (C.A.A.F. 2010) (citing *Strickland*, 466 U.S. at 687; *Mazza*, 67 M.J. at 474).

The deficiency prong requires the appellant to show his counsel's performance fell below an objective standard of reasonableness according to the prevailing standards of the profession.  *Strickland*, 466 U.S. at 688.  The prejudice prong requires the appellant to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  In doing so, the appellant "must surmount a very high hurdle."  *United States v. Moulton*, 47 M.J. 227, 229 (C.A.A.F. 1997) (citing *Strickland*, 466 U.S. at 689).  This is because counsel is presumed competent in the performance of his or her representational duties.  *United States v. Anderson*, 55 M.J. 198, 201 (C.A.A.F. 2001).

Although an objection to the question may have been sustained, we do not believe defense counsel's performance fell below the objective standard of reasonableness required by *Strickland*.  Regardless, even if counsel was deficient, Appellant suffered no prejudice from this question.  It was abundantly clear after the completion of Ms. AR's

---

[4] Additionally, we would note Master Sergeant (MSgt) LW had previously served as a victim advocate, accompanying alleged victims of sexual assault to the hospital for medical examinations.  Given the evidence admitted at trial in Appellant's case, we question whether MSgt LW would have otherwise been struck had she answered trial defense counsel's question like the remaining panel members.

testimony that she had no memory of the event and was not even aware Appellant engaged in sexual activity with her until she was informed of this fact by the case agent who had interviewed Appellant days later. As such, it is improbable the panel members gave Ms. AR's conclusory statement at the beginning of her testimony much weight, if any. Appellant's assignment of error also ignores his admissions and the forensic evidence establishing he engaged in sexual intercourse with Ms. AR. The identification of who had sexual contact with Ms. AR was never a disputed question, so a sustained objection would not have changed the result in this case.

Moreover, given the factfinders were properly instructed on their duties and obligations, we reject the assertion that Ms. AR's answer somehow invaded the province of the panel in deciding whether Appellant's conduct met the elements for sexual assault. *See generally United States v. Washington*, 57 M.J. 394, 403 (C.A.A.F. 2002) (court panels are presumed to follow instructions until demonstrated otherwise).

*Expert Witness Testimony*

During its case-in-chief, the prosecution called a forensic toxicologist to address Ms. AR's alcohol consumption and the effect alcohol has on a person's cognitive behavior and motor skills. After being recognized as an expert, the witness noted the victim had a blood alcohol content (BAC) level of .249 percent alcohol at 0141 hours when she was treated in the emergency room.[5] Then, without defense objection, the expert extrapolated that the victim's BAC levels were approximately .30 percent and .28 percent alcohol at 2315 hours and 0015 hours respectively. This time frame roughly equated to the time Appellant and Ms. AR were together during the evening of the assault.

Trial counsel next asked the expert to discuss the behavior of a normal person possessing a BAC level similar to the victim in this case. Again, without objection from the defense, the expert noted:

> Most individuals with a .249 blood alcohol that's a social drinker are going to be grossly intoxicated, and depending on the rate of the rise of that blood alcohol, you will have pretty significant observation. You'll have a thick tongue, slurred speech, stumbling. If we do, like, field sobriety tests they can't touch their nose, they can't walk a straight line, they often need support. Many individual[s] I've seen at checkpoint—DUI checkpoints would get out of a car and they lean up against the vehicle and stabilize[] themselves, so that

---

[5] For comparison purposes, the expert noted a motor vehicle operator is presumed impaired with a blood alcohol content exceeding .08 percent alcohol.

if they took them away from that you would see them wobble. They often kind of have trouble walking. Some individuals pass out from that much alcohol in their bloodstream. They literally will go to sleep.

When later asked to explain what he meant when he used the term "grossly intoxicated," the expert responded:

When you're exhibiting signs . . . such as slurred speech, gait problems, an inability to walk without assistance, incoherent speech would be defined by definition of gross intoxication, that is you've reached that level that you're brain thinking capacities are not able to control mental/motor function.

The expert also noted that someone who is "grossly intoxicated" would have extremely poor judgment when it came to weighing the consequences of their actions.

After providing this general overview about the impacts of alcohol, trial counsel asked the witness about Ms. AR's state of intoxication between 2300 and 0030 hours, leading to the following exchange which is the basis for the assignment of error.

[WIT:] She was exhibiting many of those symptoms we just described. They would lead you to the conclusion that she was grossly intoxicated.

SDC: Your Honor, I'm going to object to the basis for that question, since there is absolutely no evidence of [Ms. AR's] behavior between 11:00 and 12:30 that night.

MJ: I'm going to overrule your objection. You can consider the answer.

We review for abuse of discretion the military judge's decision regarding the scope of expert witness testimony. *United States v. Flesher*, 73 M.J. 303, 311 (C.A.A.F. 2014). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (quoting *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010)).

Military Rule of Evidence 702 provides that a witness qualified as an expert may testify as to scientific, technical, or other specialized knowledge if it will assist the factfinder in understanding the evidence or determining a fact at issue. "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it

embraces an ultimate issue to be decided by the trier of fact." Mil. R. Evid. 704. However, this rule does not permit the expert to opine on the ultimate issue of a case. *See United States v. Hays*, 62 M.J. 158, 165 (C.A.A.F. 2005).

It is clear the objection at the trial level was foundational. That is, the defense claimed there was no information or evidence in the record permitting the Government's expert to reach this opinion. We do not believe the military judge abused his discretion in overruling this basis for the objection. There was testimony that Ms. AR's cognitive behavior and motor skills were limited both before and after the sexual activity. When this evidence is combined with the BAC result, we believe the expert had a sufficient basis to opine that the victim remained intoxicated during the period she was alone with Appellant in his dormitory room. This is especially true given Appellant's statements to law enforcement after the sexual activity that Ms. AR was "like this" when he picked her up.

Appellant now argues the expert's testimony was erroneously admitted in that: (1) it improperly bolstered the testimony of the victim and other Government witnesses, and (2) it improperly concluded the victim was too intoxicated to consent to sexual activity, which was the ultimate issue in the case for the panel members to decide.

Given these allegations of error differ from the objection lodged by counsel at trial, we must decide if Appellant forfeited his complaint about these new theories of admissibility. "Usually any objection to questions asked on cross-examination must be made at the time they are asked." *United States v. Ruiz*, 54 M.J. 138, 143 (C.A.A.F. 2000). "A party is not necessarily required to refer to a specific rule by citation. A party *is* required to provide sufficient argument to make known to the military judge the basis of his objection and, where necessary to support an informed ruling, the theory behind the objection." *United States v. Datz*, 61 M.J. 37, 42 (C.A.A.F. 2005) (citing *United States v. Banker*, 60 M.J. 216 (C.A.A.F. 2004)); *United States v. Brandell*, 35 M.J. 369, 372 (C.M.A. 1992). "Where an appellant has not preserved an objection to evidence by making a timely objection, that error will be forfeited in the absence of plain error." *United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007); Mil. R. Evid. 103(d).

We believe these new theories have been forfeited, and, therefore, must only be tested for plain error. Finding none, we decline to grant relief. We would note the expert witness only testified Ms. AR showed signs of gross intoxication; he did not render any opinion on whether her level of intoxication would prevent her from appraising her actions and consenting to sexual activity. This was the ultimate question, and it was properly left for the panel members to decide in this case.

Appellant next claims the assistant trial counsel erred during sentencing argument when she compared the adult victim in this case to a child and thus inferred Appellant was a child molester. These comments, which take up less than a page of a 20-plus page argument, did not generate an objection by Appellant's trial defense counsel.

Counsel are to limit arguments to the evidence in the record and fair inferences that may be drawn from that evidence. *United States v. Paxton*, 64 M.J. 484, 488 (C.A.A.F. 2007). Whether argument is improper is a question of law we review de novo. *United States v. Marsh*, 70 M.J. 101, 104 (C.A.A.F. 2011) (citing *United States v. Pope*, 69 M.J. 328, 334 (C.A.A.F. 2011)). In applying the law to the facts of a case, however, trial counsel's comments must be examined in context of the entire court-martial. *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005).

The failure of trial defense counsel to object to argument constitutes forfeiture of the issue on appeal absent plain error. R.C.M. 919(c); *see also United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007). To establish plain error, Appellant "must prove: (1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right." *Marsh*, 70 M.J. at 104. The lack of a defense objection is relevant to a determination of prejudice because it is "some measure of the minimal impact of a prosecutor's improper comment." *United States v. Gilley*, 56 M.J. 113, 123 (C.A.A.F. 2001) (quoting *United States v. Carpenter*, 51 M.J. 393, 397 (C.A.A.F. 1999)) (internal quotation marks omitted).

We find no error—plain, obvious, or otherwise—with assistant trial counsel's argument in this case. Examining the context surrounding the entire argument, the assistant trial counsel was focusing on the victim's inability to consent, noting Appellant had been convicted of sexually assaulting "a child" as Ms. AR "arguably . . . had the mental capability of a child" due to her intoxicated state and that Ms. AR cried "like a child" after the incident.[6] This is fair argument given the evidence reflecting the victim's condition and conduct both before and after the assault. Assistant trial counsel did not argue or even infer that Appellant should be equated to a child molester or sentenced as such.

We also do not believe the argument resulted in prejudice. Notwithstanding the fact this objectionable material was an extremely small part of the sentencing argument, the relatively light sentence adjudged by the panel, especially when compared against the prosecution's recommendation that Appellant receive significant confinement and a punitive discharge, belies Appellant's claim that the panel members were unduly

---

[6] We note senior trial counsel argued in findings that the victim had the competence of a child due to her level of intoxication. It appears this statement was the genesis for assistant trial counsel's argument during sentencing.

inflamed by trial counsel's argument in this case. We are confident Appellant was sentenced on the basis of the evidence alone and his sentencing proceedings were not tainted by these references by the assistant trial counsel. *See Erickson*, 65 M.J. at 224

## Confrontation Clause Violation

Appellant next argues, pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), that the military judge erred when he allowed the Government's expert witness to testify about forensic testing results linking him to sexual activity with the victim. As recently confirmed by our superior court in *United States v. Katso*, 74 M.J. 273, 283–84 (C.A.A.F. 2015), an expert who did not perform forensic testing may still provide an opinion regarding the testing results at trial, provided the opinion is based on the expert's independent review of the case. Here, as in *Katso*, the Government's expert conducted a thorough review of the evidence against Appellant and based her conclusion on her personal assessment of the case. Thus, we find no error.

## Sufficiency of the Evidence

Finally, pursuant to *Grostefon*, Appellant asserts the evidence was factually and legally insufficient to sustain his conviction for sexual assault. Specifically, Appellant argues the prosecution failed to prove he knew or reasonably should have known Ms. AR was incapable of consenting to sexual activity due to her impairment by alcohol.

We review issues of factual and legal sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *Washington*, 57 M.J. at 399. Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987); *see also United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *Turner*, 25 M.J. at 324; *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002). The term reasonable doubt does not mean that the evidence must be free from conflict. *United States v. Lips*,

22 M.J. 679, 684 (A.F.C.M.R. 1986). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citing *United States v. Rogers*, 54 M.J. 244, 246 (C.A.A.F. 2000)).

Applying the standards of review to the evidence elicited in this case, we are convinced the evidence is legally and factually sufficient to support Appellant's conviction. Multiple witnesses called by the prosecution noted Ms. AR's cognitive behavior and motor skills were limited both before and after the sexual activity. This evidence, especially when viewed in conjunction with Ms. AR's dangerously high BAC level, provided a sufficient basis for the panel's finding that Appellant knew or should have known Ms. AR was incapable of consenting to sexual activity due to her impairment from alcohol.

In requesting reversal of his conviction, Appellant argues his version of the events in the dormitory room, which paints a picture of a consensual sexual encounter, is not refuted. We disagree. Appellant's conflicting statements to law enforcement, beginning the morning of the assault, discredit the narrative Appellant continues to cling to during this appeal. In particular, Appellant's claim that Ms. AR's only sign of intoxication was her jovial demeanor was rebutted by not only multiple witnesses and the surveillance video from the billeting lobby, but also by his initial report to law enforcement that the intoxicated Ms. AR was "like this" earlier in the evening when he came in contact with her.

*Conclusion*

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

LEAH M. CALAHAN
Clerk of the Court

15                                                                    ACM 38624