*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
CRISFIELD, GASTON, and STEWART
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Julian D. SCHMIDT**
Sergeant (E-5), U.S. Marine Corps
Appellant

**No. 201900043**

Decided: 7 August 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Matthew J. Kent

Sentence adjudged 30 October 2018 by a general court-martial convened at Marine Corps Base Camp Pendleton, California, consisting of officer and enlisted members. Sentence approved by the convening authority: reduction to E-1, confinement for 15 months, and a bad-conduct discharge.

For Appellant:
*David P. Sheldon, Esq.*
*Tami L. Mitchell, Esq.*
*Lieutenant Gregory Hargis, JAGC, USN*

For Appellee:
*Major Kerry E. Friedewald, USMC*
*Lieutenant Kimberly Rios, JAGC, USN*

Senior Judge GASTON delivered the opinion of the Court, in which Chief Judge Emeritus CRISFIELD and Judge STEWART joined.

———————————

**PUBLISHED OPINION OF THE COURT**

———————————

GASTON, Senior Judge:

A panel of officer and enlisted members convicted Appellant, contrary to his pleas, of a single specification of sexual abuse of a child, in violation of Article 120b(c), Uniform Code of Military Justice [UCMJ], 10 U.S.C. § 920b(c) (2016), for committing a lewd act upon a 15-year-old boy by indecent conduct, to wit: intentionally masturbating in the presence of the victim.[1]

Appellant asserts the following assignments of error [AOE],[2] which we reorder as follows: (1) the military judge erred in denying a Defense challenge for cause against a panel member; (2) the evidence is legally and factually insufficient to sustain Appellant's conviction; (3) the military judge erred in his instructions on the definitions of "upon" and "in the presence of" in the specification; (4) the military judge erred in failing to instruct that Appellant's honest but mistaken belief that the victim was asleep is a defense; (5) Appellant's trial defense counsel were ineffective for failing to object to the military judge's instructions on the definition of "upon" and "in the presence of"; (6) Appellant's trial defense counsel were ineffective for failing to object to the Government forensics expert's testimony as a violation of Appellant's right to confront the person who conducted the actual forensic testing; and (7) officials at Camp Pendleton unreasonably interfered with Appellant's ability to communicate and meet with his civilian appellate defense counsel.[3]

We find no prejudicial error and affirm.

———————————

[1] Appellant was acquitted of a second specification charging him with sexually abusing the same victim by touching, licking, and kissing the victim's hand with an intent to arouse and gratify his own sexual desires.

[2] Appellant's fifth, sixth, and seventh AOEs are raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[3] We have reviewed and considered this final AOE and find it to be without merit. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

## I. BACKGROUND

Appellant met the victim, "Jared,"[4] and his family through a mutual family friend, "Michelle," who lived next door to Jared's family in Carlsbad, California, and often served as a nanny for Jared and his siblings. During his regular visits to Michelle's house, Appellant became a friend and mentor to Jared and his older brother.

Jared's family moved away from Carlsbad a few months after meeting Appellant, but returned for a visit nine months later, when Jared was 15 years old. The family stayed at Michelle's house, where Appellant also stayed for two nights during their visit. On the first night Appellant slept on an air mattress on the floor of Michelle's bedroom, while Jared and his older brother slept on an air mattress on the floor in her front room. On the second night Jared was feeling nauseated, and his brother did not want to sleep next to him, so Appellant offered the air mattress in Michelle's room to Jared's brother and arranged to sleep across two upholstered swivel chairs in the front room next to the air mattress where Jared was sleeping.

Jared testified that he woke up around 0200 that night, lying on his stomach on the left side of the air mattress, and Appellant was on the mattress beside him with an arm on Jared's bare back near his shoulder blades. This frightened Jared and he slid away from Appellant off the left side of the air mattress onto the floor, where he pretended to be asleep. However, Jared's right hand was still on the mattress, and Appellant started holding it and licking and kissing Jared's fingers and then started making sounds and movements indicative of masturbation. After a few minutes Appellant made a grunting sound and then got up, and Jared heard him go wake up Michelle to drive him back to his base. Jared then heard Appellant take a shower and then, before leaving the house—while Jared was still pretending to be asleep—come over to the foot of the air mattress and pray aloud for Jared's protection.

After Appellant left, Jared, crying and upset, woke up his mother in another part of the house and told her what Appellant had done. Jared's mother called the police and sent angry text messages to Appellant confronting him about his conduct and calling him a pedophile.

During his subsequent interrogation by the Naval Criminal Investigative Service [NCIS], Appellant said that on the night in question he slept across

---

[4] The names used in this opinion are pseudonyms.

the two upholstered swivel chairs, one facing the other, in the front room of Michelle's house. He denied touching or being on the air mattress with Jared, and initially denied masturbating. When the NCIS agent brought up the possibility of DNA evidence, Appellant admitted masturbating in the early morning hours under a red blanket while lying across the chairs, to help him sleep. He said it was a mistake. He said he eventually ejaculated into the red blanket and then threw it on the couch when he got up. He said that when he received the text messages from Jared's mother, he was confused and suspected Jared must have seen him masturbating. Appellant did not tell the NCIS agent he believed Jared was asleep. However, he nodded when the NCIS agent said to him, "I mean, you were laying there, you're like, this kid's sleeping, I'm just going to masturbate to try to go to sleep, you know, take my sleeping pills, whatever, man, everybody does their own thing."[5]

The police collected the red blanket from the couch, and forensic analysis detected semen on it that was a match for Appellant's DNA.

At trial, Jared was cross-examined about his history of lying and acting out to get attention or get out of trouble, his history of calling Appellant derogatory names, and his prior inconsistent statements about how Appellant was positioned during the incident. Michelle testified that in her opinion Jared was untruthful. She also testified that when she left with Appellant that morning, Jared was lying on the floor to the left of the air mattress, apparently asleep, and the upholstered swivel chairs were facing the room parallel to each other.

Additional facts necessary to resolve the AOEs are discussed below.

## II. DISCUSSION

### A. Challenge for Cause

Appellant asserts the military judge erred in denying a Defense challenge for cause against Sergeant Major [SgtMaj] "Ortiz" on grounds of implied bias. We review a military judge's ruling on a challenge for cause for an abuse of discretion. *United States v. Woods*, 74 M.J. 238, 243 (C.A.A.F. 2015). While rulings based on actual bias are afforded a high degree of deference, "issues of implied bias are reviewed under a standard less deferential than abuse of discretion, but more deferential than de novo." *Id.* (quoting *United States v. Downing*, 56 M.J. 419, 422 (C.A.A.F. 2002)).

---

[5] Prosecution Exhibit 6.

"As a matter of due process, an accused has a constitutional right, as well as a regulatory right, to a fair and impartial panel." *Downing*, 56 M.J. at 421 (quoting *United States v. Wiesen*, 56 M.J. 172, 174 (C.A.A.F. 2001)). "A member shall be excused for cause whenever it appears that the member . . . [s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." R.C.M. 912(f)(1)(N). To that end, members may be excused on grounds of either actual or implied bias. *Downing*, 56 M.J. at 422. Defense challenges for cause on either basis must be liberally granted. *United States v. James*, 61 M.J. 132, 139 (C.A.A.F. 2005).

The test for implied bias is an objective one that considers "the public's perception of fairness in having a particular member as part of the court-martial panel." *Woods*, 74 M.J. at 243 (quoting *United States v. Peters*, 74 M.J. 31, 34 (C.A.A.F. 2015)). "[A]t its core, implied bias addresses the perception or appearance of fairness of the military justice system." *Downing*, 56 M.J. at 422 (citation omitted). The totality of the circumstances are considered in making this assessment. *Woods*, 74 M.J. at 243 (citation omitted). While the military judge's observations of a member's demeanor are normally used to assess actual bias, our superior court has found they are "also relevant to an objective observer's consideration" in addressing questions of implied bias. *Downing*, 56 M.J. at 423.

Here, SgtMaj Ortiz stated during voir dire that when he was a child—nearly 40 years prior to Appellant's court-martial—he found out that his nine-year-old cousin, with whom he was very close at the time, had been sexually molested. Although he was not involved in any criminal proceedings, the experience had upset him and he had been disappointed (though not particularly surprised) that the offender (his uncle) was not prosecuted. However, his uncle had left the area soon afterward, and in the intervening decades SgtMaj Ortiz had lost touch with his cousin, embarked on a 29-year career in the Marine Corps, and acquired a more informed, detached perspective on the criminal justice process. Consequently, he stated his firm belief that he was unbiased and could be a fair and impartial member on Appellant's court-martial.

Appellant's trial defense counsel argued the incident involving SgtMaj Ortiz's cousin created an issue of implied bias. The military judge disagreed. He found SgtMaj Ortiz's "continence, bearing and manner" in answering the questions about his impartiality were such that "when he stated that he

could be unbiased, he did so with great conviction."[6] The military judge also pointed to the nearly 40-year span of time since the cousin's abuse occurred and the intervening circumstances of SgtMaj Ortiz's long career and development in the Marine Corps. Based on his assessment, the military judge found no actual bias, and further stated that "through the eyes of the public, focusing on the appearance of fairness, I believe anyone who witnessed [SgtMaj Ortiz]'s colloquially [sic] and his demeanor throughout the instructions in voir dire, would believe he would not be prejudiced."[7] As a result, while acknowledging the liberal grant mandate, the military judge found no implied bias and denied the Defense challenge.

We find no error in the ruling articulated by the military judge. As our superior court has noted, "the fact that a member was close to someone who had been a victim of a similar crime is not grounds for per se disqualification." *United States v. Terry*, 64 M.J. 295, 303 (C.A.A.F. 2007) (citation omitted). Furthermore, "regardless of a member's prior exposure to a crime, it is often possible for a member to rehabilitate himself before the military judge by honestly claiming that he would not be biased." *Id.* The member did so here, reasonably related his lack of bias to his mature, detached view of the criminal justice system wrought by a long career in the Marine Corps, and he did so with such conviction that the military judge remarked on it. Under the totality of the circumstances—particularly the passage of nearly four decades since the incident occurred during childhood to a cousin he later lost touch with—we believe that most persons in SgtMaj Ortiz's position would not have difficulty sitting on Appellant's trial. Thus, we conclude an objective observer would not have doubts about the fairness of Appellant's court-martial panel.

## B. Legal and Factual Sufficiency

Appellant asserts the evidence is legally and factually insufficient to support his conviction. We review such questions de novo. Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

To determine legal sufficiency, we ask whether, "considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324-25 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In conducting this analysis, we must "draw

---

[6] R. at 84.

[7] *Id.* at 85.

every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Gutierrez*, 74 M.J. 61, 65 (C.A.A.F. 2015).

In evaluating factual sufficiency, we determine whether, after weighing the evidence in the record of trial and making allowances for not having observed the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325 (C.M.A. 1987). In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. Proof beyond a "[r]easonable doubt, however, does not mean the evidence must be free from conflict." *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

Appellant was convicted of sexual abuse of a child for "commit[ting] a lewd act upon [Jared] by . . . engaging in indecent conduct, to wit: masturbating, intentionally done in the presence of [Jared]." To prove this offense, the Government was required to prove: (1) that Appellant committed a lewd act upon Jared by engaging in indecent conduct, to wit: masturbating, intentionally done in the presence of Jared; (2) that at the time Jared had not attained the age of 16 years; and (3) that the conduct amounted to a form of immorality relating to a sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desires, or deprave morals with respect to sexual relations. *Manual for Courts-Martial, United States* (2016 ed.) [*MCM*], Part IV, ¶ 45b.b.(4)(e).

Appellant asserts the evidence is insufficient as to the first element, that he committed a lewd act *upon* Jared by masturbating, *intentionally* done *in the presence of* Jared. He argues that committing a lewd act "upon" a victim requires complete or approximate contact with the victim; that for indecent conduct to be done "in the presence of" a victim requires the victim not only to be in close proximity, but also to be aware of the conduct; and that "intentionally" requires that the accused intend that the victim be aware of the conduct. He argues that because the charged language creates a specific-intent crime, an honest mistake of fact as to the victim's awareness of his conduct is a defense which must be disproven beyond a reasonable doubt. He argues that although he masturbated in the same room as Jared, Jared was by his own testimony pretending to be asleep at the time, which led Appellant to honestly believe that Jared was asleep and thus unaware that Appellant was masturbating. Appellant asserts that this defense of honest mistake of fact was not disproven beyond a reasonable doubt; therefore, the evidence does not support his conviction.

*1. Legal definition of "in the presence of"*

"Construction of a statute is a question of law we review de novo." *United States v. Kelly*, 77 M.J. 404, 406 (C.A.A.F. 2018) (citation omitted). "[W]e interpret words and phrases used in the UCMJ by examining the ordinary meaning of the language, the context in which the language is used, and the broader statutory context." *United States v. Pease*, 75 M.J. 180, 184 (C.A.A.F. 2016). If a statute is clear and unambiguous—that is, susceptible to only one interpretation—we use its plain meaning and apply it as written. *United States v. Kohlbek*, 78 M.J. 326, 331 (C.A.A.F. 2019); *United States v. Clark*, 62 M.J. 195, 198 (C.A.A.F. 2005) (citations omitted). Otherwise, "there are a number of factors that provide a framework for engaging in statutory interpretation . . . includ[ing] the contemporaneous history of the statute; the contemporaneous interpretation of the statute; and subsequent legislative action or inaction regarding the statute." *United States v. Tardif*, 57 M.J. 219, 226 (C.A.A.F. 2002) (Crawford, C.J., dissenting). We may also resort to case law to resolve any ambiguity, although fundamentally "case law must comport with [the statute], not vice versa." *United States v. Warner*, 62 M.J. 114, 120 n.30 (CA.A.F. 2005). "We assume that Congress is aware of existing law when it passes legislation." *United States v. McDonald*, 78 M.J. 376, 380 (C.A.A.F. 2019) (quoting *Miles v. Apex Marine Corps*, 498 U.S. 19, 32 (1990)).

Sexual abuse of a child under Article 120b(c), UCMJ, is defined as "commit[ting] a lewd act *upon* a child." 10 U.S.C. § 920b(c) (emphasis added). The definition of "lewd act" includes "any indecent conduct, intentionally done *with or in the presence of* a child, including via any communication technology, that amounts to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations." 10 U.S.C. § 920b(h)(5)(D) (emphasis added). The statute does not define "upon" or "in the presence of." However, based on the above statutory language, we determine that for lewd acts consisting of indecent conduct, the phrase "*upon* a child" is essentially subsumed within the statute's further definition of indecent conduct done "*with* or *in the presence of a child.*"

Here, we need focus only on the latter half of that phrase, "*in the presence of* a child," as that is what the specification at issue alleges. Considering the ordinary meaning of "in the presence of," we find it is susceptible to more than one interpretation. The dictionary definition of "in the presence of" is "in a condition of being in view or at hand." *Presence, Merriam-Webster's Collegiate Dictionary* (10th ed. 1993) (defining "presence" as "the fact or condition of being present," and "present" as "being in view or at hand"). Black's Law Dictionary defines "presence" as "[t]he state or fact of being in a particular place and time" and "[c]lose proximity coupled with awareness." *Black's Law*

*Dictionary* (9th ed. 2009). Combined, these definitions suggest that for A's conduct to be "in the presence of" B, the two are related in either (or both) of two different respects: first, a connection between their relative locations (A's conduct being "at hand" or "in close proximity" to B); and second, a sensory connection between them (A's conduct being "in view" of B, who is "aware" of it).

The use of "in the presence of" was adopted and developed in the context of the offense of indecent liberties with a child under Article 134, UCMJ—the predecessor to the current sexual abuse of a child by indecent conduct offense under Article 120b(c). In an early case, *United States v. Brown*, 13 C.M.R. 10 (C.M.A. 1953), our superior court found the offense of indecent liberties "*with a child*" did not require physical contact. The court determined that the "purpose of this type of legislation is to protect children under a certain age from those acts which have a tendency to corrupt their morals," and the statutory language was "broad enough to cover specifically those offensive situations in which an assault or battery is missing but the immoral and indecent liberties are so offensive that the minor is harmed." *Id.* at 13-14. The court reasoned that "the injury to the child and the consequential damage to society from the performance of the depraved act *in [the child's] presence* are just as great as when there is an actual physical contact between the performer and the child." *Id.* at 13 (emphasis added). Thus, *Brown* established that certain conduct done "in the presence of" a child could amount to an indecent liberty due to the connection between the conduct and the harm it causes to the child.

After *Brown*, the court declined to extend "in the presence of" to situations where the conduct occurred outside of the child's physical presence, due to the lack of a sufficient sensory connection between the child and the accused's conduct. In *United States v. Knowles*, 35 C.M.R. 376 (C.M.A. 1965), in the context of obscene language conveyed over the telephone, the court found that for an indecent liberty to be done "in the presence of" a minor "requires greater conjunction of the several senses of the victim with those of the accused than that of hearing a voice over a telephone wire." *Id.* at 377-78. Subsequently, in *United States v. Miller*, 67 M.J. 87 (C.A.A.F. 2008), the court held that conduct done in the child's constructive presence via Internet-based, audio-visual communication was also not "in the presence of" the child. *Id.* at 90. In addition to citing post-*Knowles* language in the *MCM* requiring that an indecent liberty "must be taken *in the physical presence of the child*," the court in *Miller* also pointed to the language we cited above from Black's Law Dictionary, defining "presence" as "[c]lose proximity *coupled with awareness*." *Miller*, 67 M.J. at 89-90 (emphasis added).

Adopting *Miller*'s use of "[c]lose proximity coupled with awareness," our sister courts found that in order to sustain a conviction for indecent liberties with a child, the child had to be aware of the conduct. In *United States v. Burkhart*, 72 M.J. 590 (A.F. Ct. Crim. App. 2013), the conduct at issue was the appellant masturbating while his three-year-old daughter was nearby asleep or otherwise unaware of his conduct. Reversing the conviction, the Air Force Court of Criminal Appeals stated that "the child must be aware of the accused's conduct," and pointed to the statutory intent of the offense which, similar to what the court in *Brown* found, was to protect children from "indecent and immoral acts which cause [them] shame, embarrassment, and humiliation . . . or lead them further down the road to delinquency . . . [or] have a tendency to corrupt their morals"—all harms which derive from the child's awareness of the offensive conduct. *Burkhart*, 72 M.J. at 594 (citations and internal quotation marks omitted). Similarly, the Army Court of Criminal Appeals summarily rejected a conviction where the government "did not prove that the child . . . was aware of the indecent act alleged sufficient to establish the offense of indecent liberty with a child . . . ." *United States v. Gould*, No. 20120727, 2014 CCA LEXIS 694, at *2 (A. Ct. Crim. App. Sep. 16, 2014) (unpub. op.), *rev'd in part on other grounds*, 75 M.J. 22 (2015).

This Court reached a similar conclusion where the appellant pled guilty to indecent liberty with a child for having sexual intercourse with his wife while their five-year-old niece was unconscious on the bed beside them. *United States v. Anderson*, No. 201200499, 2013 CCA LEXIS 517 (N-M. Ct. Crim. App. June 27, 2013) (unpub. op.). Drawing from the discussion and reasoning in *Miller* and *Burkhart*, we concluded that "to sustain a charge of indecent liberty under Article 120(j), UCMJ, the child must at least have some awareness that the accused is in her physical presence." *Anderson*, 2013 CCA LEXIS 517, at *16. We held that because the providence inquiry indicated the child "was unconscious, and therefore not aware that the appellant and his wife engaged in sexual intercourse in the bed next to her," there was substantial basis to question Appellant's plea, and we set aside his conviction. *Id. See also United States v. Brown*, 39 M.J. 688, 690 (N.M.C.M.R. 1993) (setting aside the appellant's plea for masturbating unobserved near his sleeping niece, stating we had "found no case and none has been brought to our attention that upholds a conviction for committing indecent acts with another in violation of Article 134, UCMJ, where the other person is sleeping and does not observe the act or acts").

We find that the discussion and reasoning in the above cases compel the same conclusion regarding the victim's awareness for conduct done "*in the presence* of a child" under the current version of this offense, now codified as sexual abuse of a child by indecent conduct. The definitional language under which Appellant was convicted is much the same as that used in the former

indecent liberties offense, with one key difference: in the current statute Congress filled the gap created by *Knowles* and *Miller* by more broadly defining "in the presence of a child" as "including via any communication technology." UCMJ art. 120b(h)(5)(D). Thus, sexual abuse of a child by indecent conduct now does not require physical presence at all and may be accomplished by purely constructive presence, such as through the sort of Internet-based, video-communication technology at issue in *Miller*, or over a telephone line as in *Knowles*.

In broadening the meaning of "in the presence of" from physical presence to a more generalized sort of presence that can be accomplished "via *any* communication technology," the new statutory language places even greater emphasis on construing "in the presence of" as less about the proximity of the relative locations of A's conduct and B and more about the sensory connection between the two. The word "communication" itself means "a process by which information is *exchanged between* individuals through a common system of symbols, signs, or behavior." *Communication, Merriam-Webster's Collegiate Dictionary* (10th ed. 1993) (emphasis added). "Communication technology," then, is a mechanism by which the information of A's conduct is *exchanged* (through A's observable behavior) *between* A and B. In this context, A's conduct is not done "in the presence of" B unless B is aware of it, because absent a sufficient sensory connection leading to such awareness, nothing about A's conduct is actually being exchanged between A and B.[8]

We find the offense of sexual abuse of a child by indecent conduct—like its predecessor, indecent liberties with a child—requires that in order for the accused's conduct to be done "in the presence of" a child, the child must be aware of it. This interpretation comports with our superior court's longstanding view that the "purpose of this type of legislation is to protect children

---

[8] For this reason, we reject the Government's argument that our unpublished decision in *United States v. Lopez*, No. 201700252, 2019 CCA LEXIS 37 (N-M. Ct. Crim. App. Jan 31, 2019) has bearing on this case. The offense at issue in *Lopez*—committing a lewd act by intentionally exposing one's genitalia to a child—is separately defined under the current statute and does not use the operative phrase at issue here: "in the presence of." Rather, the word at issue in *Lopez* was "expose," which we found meant "to lay open . . . leave unprotected . . . to make accessible." *Id.* at *5 (quoting *Webster's New World Dictionary of American English* (3d. College ed. 1994), at 479). This, we found, "place[d] the focus on the appellant's actions, not [the victim's] awareness," as did the alleged intent of the exposure, which was to arouse or gratify the *appellant's* sexual desires. *Id.* at 5-6. Here, the focus, through use of a different operative phrase, *is* on the *victim's* awareness.

under a certain age from those acts which have a tendency to corrupt their morals." *Brown*, 13 C.M.R. at 13. The focus of the revised statute thus remains on prohibiting indecent and immoral conduct that causes the sort of corrupting harm to children—shame, embarrassment, humiliation, juvenile delinquency—which can occur by the conduct merely being done in their presence (including via communication technology). In order for conduct to cause that type of harm to a child, there must be a sufficient "conjunction of . . . [at least one] sense[ ] of the victim with those of the accused," *Knowles*, 35 C.M.R. at 378, that makes the child aware of the conduct.

This interpretation is consistent with our previous holdings, and those of our sister courts, that if a child is asleep or otherwise oblivious to the conduct, then the conduct is not done "in the presence of" the child. Arguing against this conclusion, the Government would have us remove the child's awareness of the conduct from the "in-the-presence-of" determination and use it instead as an additional factor for assessing whether the conduct is "indecent." We do not disagree that the absence of awareness by the child may also lead to the conclusion that the conduct at issue is not indecent, which requires an examination of all the surrounding circumstances. *See United States v. Rollins,* 61 M.J. 338, 344 (C.A.A.F. 2005). However, given the statutory language in both its current and its historical context, we conclude that in order for conduct charged as having been done "in the presence of" a child to amount to a "lewd act," which is ultimately what the statute requires, the child's awareness of the conduct is a prerequisite.

Accordingly, we hold that with respect to the offense of sexual abuse of a child by indecent conduct, in order for the conduct to be done "in the presence of" a child, there must be a sufficient sensory connection for the child to be aware of it. We further hold that for indecent conduct to be "*intentionally* done . . . in the presence of a child,"[9] the accused must intend that the child be aware of the conduct. As such, where raised by the evidence, an honest mistake of fact as to the child's awareness of the conduct is a defense which must be disproven beyond a reasonable doubt. Rule for Courts-Martial [R.C.M.] 916(b)(1), 916(j)(1).

---

[9] Because the clause, "intentionally done . . . in the presence of a child," is set off by commas from the remainder of the definitional language in the statute, we construe "intentionally" to apply to both other elements within that clause—i.e., not only to doing the conduct, but also to doing it in the presence of a child.

### 2. Application to the evidence

Here, we find the evidence adduced at trial supports the elements of the offense. Jared had a sufficient sensory connection to Appellant's conduct that he was aware of it as it was occurring. He woke up to find Appellant beside him on the mattress, felt Appellant's hand on his back, and slid off the mattress to distance himself from Appellant. He then felt Appellant kissing and licking his fingers. He then heard sounds indicative of masturbation, which Appellant later admitted to NCIS he had intentionally done and was forensically corroborated by the semen found on the red blanket matching Appellant's DNA. Fifteen years old at the time, Jared was scared by Appellant's actions to the point of pretending to be asleep. Based on these surrounding facts and circumstances, we find Appellant's conduct amounted to a form of immorality relating to a sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desires, or deprave morals with respect to sexual relations. It was therefore a lewd act.

Appellant argues the evidence does not support beyond a reasonable doubt that his conduct was intentionally done in Jared's presence—i.e., Jared's awareness—because he was honestly mistaken that Jared was asleep. We disagree. While Jared testified he pretended to be asleep, and appeared asleep to Michelle when she later walked past him to take Appellant back to base, the only direct evidence that Appellant honestly believed Jared was asleep was his nodding when the NCIS agent said during his interview, "I mean, you were laying there, you're like, this kid's sleeping, I'm just going to masturbate to try to go to sleep, you know, take my sleeping pills, whatever, man, everybody does their own thing."[10] This is very thin evidence upon which to find that Appellant honestly believed Jared was asleep.

The weight of the other evidence, by contrast, strongly supports that Appellant masturbated under circumstances in which he knew that Jared, despite pretending to be asleep, was aware of what was going on. Appellant was the one who suggested that Jared's brother go sleep on the air mattress in Michelle's room while Appellant slept in the room with Jared. Appellant then moved down onto the mattress with Jared and put his hand on Jared's back, which caused Jared to move away from Appellant onto the floor, where Michelle later found him. This circumstance alone makes it singularly unconvincing that Appellant actually believed Jared was asleep during this

---

[10] Prosecution Exhibit 6.

time. After that happened, rather than back off, Appellant proceeded to take Jared's hand, kiss and lick Jared's fingers,[11] and then masturbate. This ongoing physical contact distinguishes this case from the other cases discussed above, involving conduct by an accused not in physical contact with a sleeping or otherwise unaware victim.

Considering the evidence in the light most favorable to the prosecution, we conclude a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt. The evidence is thus legally sufficient to support the convictions. Regarding factual sufficiency, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

**C. Instructional Error**

After the close of the case on the merits, the military judge discussed the findings instructions with the parties off the record. He then asked on the record, "Do counsel for either side have any objections to the findings instructions in their current form?" Appellant's trial defense counsel responded, "No, sir."[12] The military judge then asked, "Any requests for instructions that do not appear in the findings instructions?" Appellant's trial defense counsel responded, "No, Your Honor."[13]

---

[11] Although Appellant was acquitted of another specification charging these other acts as separate lewd acts, we are not bound by that acquittal from viewing this as contextual evidence to support the offense of which he was convicted. While the members may not have found these acts proven beyond a reasonable doubt (or else found the evidence for the elements of that specification lacking in some other respect), those acts are not elements which must be proven beyond a reasonable doubt for the indecent-conduct specification we are considering here. *See United States v. Hicks*, 24 M.J. 3, 9 (C.M.A. 1987) (distinguishing between a not-guilty verdict's indication that the prosecution did not prove every element of the charged offense beyond a reasonable doubt and the use of other-acts evidence—which does not have to result in criminal liability or even constitute a crime in order to be admissible under Military Rule of Evidence 404(b)—to prove some other offense). Nor do we find any of the inconsistencies of Jared's prior statements compelling enough to disbelieve his testimony that Appellant performed these other acts, particularly when Jared's account is so strongly corroborated in its central claims.

[12] R. at 253.

[13] *Id.*

In delivering his instructions to the members, the military judge provided the elements of the offense of sexual abuse of a child in Specification 2 of the Charge as follows:

> That on or about 29 August 2016, at or near Carlsbad, California, the accused committed a lewd act upon [Jared] by engaging in indecent conduct, to wit: Masturbating, intentionally done in the presence of [Jared];

> That at the time, [Jared] had not attained the age of 16 years; and,

> That the conduct amount [sic] to a form of immorality relating to a sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, intends [sic] to excite sexual desires, or deprave morals with respect to sexual relations.[14]

The military judge did not instruct on the defense of mistake of fact as to age, nor did he instruct on any defense of mistake of fact as to whether the victim was asleep. At the close of his findings instructions, the military judge asked, "Do counsel object to any instructions given or request any additional instructions?" Appellant's trial defense counsel responded, "No, Your Honor."[15]

During deliberations, the senior member submitted a question to the military judge asking with respect to Specification 2, "What does 'upon' mean and what does 'in the presence of' mean?"[16] During an Article 39(a), UCMJ, session outside the presence of the members, the military judge informed the parties he intended to answer the question by providing the statutory definition of "lewd act" and then advising that "absent specific legal technical definition, the members are to apply their own common sense understanding the definition of words." When asked whether he had any objection to that instruction, Appellant's trial defense counsel stated, "I do not, sir. There is no definition for the record in the Benchbook."[17]

---

[14] *Id.* at 255.

[15] *Id.* at 294.

[16] *Id.* at 296.

[17] *Id.* at 297.

The military judge then instructed the members as follows:

> "Lewd act" is defined as any indecent conduct intentionally done with or in the presence of a child including, via any communication technology, that amounts to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or to deprave morals with respect to sexual relations. . . .

> So when the offense alleges that the accused committed a lewd act upon [Jared], that is, essentially—that is statutory language as articulated in the specification is what he has to had done upon him. So beyond that, you, the members, are in the absence of a more specific legal definition. Members are to apply their common sense and understanding of the term of words and that applies to the terms in the presence of as well.[18]

The military judge then asked the senior member, "Does that answer your question?" and the senior member responded, "Yes, Your Honor."[19]

Appellant asserts the military judge erred in his instructions about the definition of "upon" and "in the presence of" regarding the first element of the specification, and further erred by failing to instruct that Appellant's honest but mistaken belief that the victim was asleep is a defense to the offense. The Government argues that Appellant waived any asserted instructional error when his trial defense counsel repeatedly stated he had no objections or additions to the military judge's instructions.

"Whether an appellant has waived an issue is a legal question that this Court reviews de novo. Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020) (citation and internal quotation marks omitted). In *Davis*, the military judge had a preliminary discussion with the parties regarding the findings instructions he intended to give. He asked whether there were any objections or requests for additional instructions, to which the trial defense counsel responded, "No changes, sir." *Id.* at 330. Subsequently, after granting a finding of not guilty to one of the specifications and marking the instructions as an appellate exhibit, the military judge again asked if there were any objections to the findings instructions, to which

---

[18] *Id.* at 297-98.

[19] *Id.* at 298.

the trial defense counsel responded, "No, Your Honor." *Id.* The military judge then provided the instructions to the members.

When the appellant claimed error on appeal regarding the military judge's instruction on an element of one of the offenses, the court in *Davis* found that:

> Appellant did not just fail to object and thereby merely forfeited [sic] his claim. He affirmatively declined to object to the military judge's instructions and offered no additional instructions. By expressly and unequivocally acquiescing to the military judge's instructions, Appellant waived all objections to the instructions, including in regards to the elements of the offense.

*Id.* at 331 (citations and internal quotation marks omitted). Having found the appellant affirmatively waived any objection to the findings instructions, the court determined it had "nothing left . . . to correct on appeal" and declined to address his assertion of legal error regarding the instructions. *Id.* at 331-32.

We find Appellant's assertions of instructional error are waived under *Davis*. The factual scenario presented here is virtually identical to *Davis*, with the exception that in this case Appellant's trial defense counsel affirmatively declined to object to the military judge's instructions and offered no additional instructions not twice, but three times (including the additional instructions given in response to the senior member's question during deliberations). Through these repeated affirmative declinations, Appellant "expressly and unequivocally acquiesce[d] to the military judge's instructions," including both the way he handled the definitions of "upon" and "in the presence of" for the elements of the offense and the lack of any instruction on honest mistake of fact as a defense. "As Appellant affirmatively waived any objection the military judge's findings instructions, there is nothing left for us to correct on appeal." Id. at 331 (citations omitted).

We specifically find an instruction on the defense of mistake of fact was also waived under *Davis* because any such instruction hinged on the instruction for "in the presence of," regarding which any assertion of error was waived. We acknowledge that just as a military judge has a duty to correctly instruct on the elements of the offenses, the military judge also has a sua sponte duty to instruct on any defenses reasonably raised by the evidence. R.C.M. 920(e); *United States v. Barnes*, 39 M.J. 230, 233 (C.A.A.F. 1994). However, instructions on defenses may also be affirmatively waived. *Id.* We find no logical basis upon which to find that in expressly and unequivocally acquiescing to the military judge's instructions as a whole, thereby waiving any issue as to the elements of the offense, Appellant did not also waive any

issue as to the lack of a mistake-of-fact instruction which was contingent on the instructions on the elements. Given the interrelationship between the interpretation of conduct intentionally done "in the presence of" a child with respect to the elements of the offense (as requiring the victim's awareness) and the defense of honest mistake of fact (as to the victim's awareness), we find it impossible under *Davis* to hold that the assertion of error was waived for one instruction and not the other.

Hence, we conclude, as the court did in *Davis*, that Appellant affirmatively waived, as opposed to merely forfeited, the issues he now asserts. *See Davis*, 79 M.J. at 332. While Appellant argues that *Miller, Burkhart, Anderson*, and other cases discussed above support his contention that the instructions were erroneous, we find that like the appellant in *Davis*, "Appellant was tried after the applicable precedents were decided, yet affirmatively declined to object to the military judge's instructions." *Davis*, 79 M.J. at 331-32; *cf. United States v. Haverty*, 79 M.J. 199 (C.A.A.F. 2017) (applying forfeiture, as opposed to waiver, where the relevant controlling precedents were decided *after* the appellant's trial but before his appeal). As our discussion above demonstrates, our superior court, our sister courts, and this Court have all previously held that the offense at issue here is focused on prohibiting conduct that when done in a child's presence causes harm to the child, which requires a sufficient "conjunction of the several senses of the victim with those of the accused." *Knowles*, 35 C.M.R. at 377-78. Thus, we do not construe our holding today as departing from the central theme of these precedents, which all stand for the proposition that some level of awareness of the accused's conduct is required on the part of the child for the conduct to be done "in the presence of" the child.[20]

We recognize that under our superior court's interpretation of Article 66, UCMJ, we are empowered "to determine whether to leave an accused's waiver intact, or to correct the error." *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016). Here, we determine the appropriate course is to leave the waiver intact. As our superior court has explained, instructions "should fairly and adequately cover the issues presented, and should include such other explanations, descriptions, or directions as may be necessary and which are *properly requested by a party* or which the military judge determines, sua

---

[20] Indeed, since Appellant's conduct was done not just within the sensory perception of Jared but also within his *physical presence*, the facts of this case are even more firmly rooted in the case law's interpretation of "in the presence of" than the current statute now requires.

sponte, should be given." *United States v. Bailey*, 77 M.J. 11, 13-14 (C.A.A.F. 2017) (citing R.C.M. 920(a), Discussion; R.C.M. 920(e)(7)) (emphasis added). Where a discrete issue is sufficiently arcane that it lacks specific, amplifying guidance in the model instructions of the Military Judges' Benchbook, Dept. of the Army Pamphlet 27-9 [Benchbook], it is incumbent upon the parties to research and request tailored instructions as necessary to adequately address the issue, based on their theory of the case and the facts they have reason to believe will be proven at trial.

As discussed in greater detail below, Appellant's trial defense counsel made closing arguments that strongly suggest at least a passing familiarity with the pre-existing case law regarding how "in the presence of" should be interpreted. His greater knowledge of the facts of the case placed him in a far better position than the military judge to request and argue for instructions that adequately covered that issue and the related mistake-of-fact defense he intended to (and did) argue in closing. Given his ability to confront these issues head-on at the trial level, his affirmative declination to do so despite repeated inquiries by the military judge is precisely why the principle of waiver exists. *See United States v. Wall,* 349 F.3d 18, 24 (1st Cir. 2003) ("[C]ounsel twice confirmed upon inquiry from the judge that he had 'no objection and no additional requests [regarding the instructions].' Having directly bypassed an offered opportunity to challenge and perhaps modify the instructions, appellant waived any right to object to them on appeal."), *quoted in Davis*, 79 M.J. at 332. Thus, while military judges remain responsible for identifying and addressing instructional issues as they arise,[21] the principle of waiver necessitates that counsel "must be especially careful to raise any objections that they might have to proposed instructions when the military judge asks them." *Davis*, 79 M.J. at 332 (Maggs, J., concurring).

---

[21] Our holding today does not relieve military judges of their own obligation to ensure the instructions "*include such other explanations, descriptions, or directions as may be necessary and* which are properly requested by a party or *which the military judge determines, sua sponte, should be given.*" *Bailey*, 77 M.J. at 13-14 (emphasis added). To that end, the model Benchbook instructions should be considered the starting point, as opposed to the destination, for this endeavor. As we have said before, "we cannot overemphasize the duty of trial judges to (1) thoroughly examine the evidence from both parties' perspectives, in order to ensure the instructions *fairly* and *adequately* cover the issues presented . . . and then (2) critically evaluate the instructions from the members' perspective, in order to ensure they provide an accurate, complete, and *intelligible* statement of the law. *United States v. Johnson*, 2020 CCA LEXIS 118, at \*36 n.30 (N-M. Ct. Crim. App. 2020) (citations and internal quotation marks omitted) (emphasis in original).

**D. Ineffective Assistance of Counsel**

Appellant asserts his trial defense counsel were ineffective for failing to object to the military judge's instructions discussed above and for failing to object to testimony from the Government forensics expert on grounds of Appellant's confrontation right. We review claims of ineffective assistance of counsel de novo. *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009) (citations omitted).

Our review uses the two-part test outlined in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "In order to prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361-62 (C.A.A.F. 2010) (citing *Strickland*, 466 U.S. at 687). When a claim for ineffective assistance of counsel is premised on trial defense counsel's failure to move the court to take some action, "an appellant must show that there is a reasonable probability that such a motion would have been meritorious." *United States v. McConnell*, 55 M.J. 479, 482 (C.A.A.F. 2001) (citation and internal quotation marks omitted). "Failure to raise a meritless argument does not constitute ineffective assistance." *United States v. Napoleon*, 46 M.J. 279, 284 (C.A.A.F. 1997) (quoting *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985)). With respect to whether the deficiency resulted in prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*1. Instructional error*

Appellant asserts his trial defense counsel were ineffective for failing to object to the military judge's instructions on the definition of "upon" and "in the presence of." We include in our analysis the counsel's additional failure to request the related mistake-of-fact instruction. As discussed above, we have concluded that in affirmatively declining to object or request additional instructions, Appellant's trial defense counsel expressly and unequivocally acquiesced to the military judge's instructions, which waived these issues. Under such circumstances, the Supreme Court has found that "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Strickland*, 466 U.S. at 689-90).

Here, Appellant's trial defense counsel were confronted with an issue for which there were pertinent holdings discussed in the case law, but no amplifying definitions in the Benchbook. Despite the lack of definitional guidance in the Benchbook, however, Appellant's civilian counsel appears to have thought through the issue and made exactly the kind of closing argument that the case law contemplates:

> Masturbating in a room where you think everybody is asleep and no one is watching you and no one is aware, doesn't meet the elements of what they're saying. That is not a crime. Any more than two parents having sexual relations and the kid on the other side of the apartment waking up and walking in. It is not the same thing. Someone in a bunk underneath a blanket while everyone is asleep pitching, touching themselves, and someone just happens to be two bunks down and overhears it, that doesn't mean that you are a child molester.[22]

He later argued, "The kid was in the room. That is not enough. It must be a lewd act. . . . If you are underneath a blanket, masturbating, you cover yourself up, and you think everyone is sleeping, it's dark, it's not a lewd act upon him."[23]

Assuming, without deciding, that Appellant's counsel were deficient in failing to pursue tailored instructions in support of these arguments, we find no prejudice applying *Strickland* with the "scrupulous care" these circumstances demand. Based on the evidence adduced at trial, we cannot say that different instructions would have swayed the members' findings, particularly where we ourselves have found the charge proven beyond a reasonable doubt despite largely accepting and adhering to Appellant's view of the law. The mere fact that the members rejected Appellant's trial defense counsel's view of the evidence does not itself show a reasonable probability that, but for any deficiency in the counsel's performance, the result of the proceeding would have been different. To the contrary, had the defense counsel pursued a more detailed instruction for "in the presence of" as including Jared's awareness of Appellant's conduct, the evidence would still have strongly supported a guilty finding, since Jared clearly *was* aware of the conduct. Moreover, as we discussed in our factual sufficiency analysis, the defense of honest mistake of fact rested on such thin evidence that it is far from clear the members would

---

[22] R. at 279.

[23] *Id.* at 283.

have found Appellant actually believed Jared was asleep had they been instructed on that defense. Given the weight of the evidence in this case, as explored more fully above, we do not find a probability sufficient to undermine confidence in the outcome.

### 2. *Confrontation Clause*

At trial, Dr. "Kellogg" of the U.S. Army Criminal Investigative Laboratory [USACIL] testified as a Government expert in DNA forensic examination about the forensic testing and analysis work completed by USACIL in Appellant's case. He was not the laboratory technician who conducted the actual tests, who was unavailable for Appellant's trial because she was testifying in another court-martial. Dr. Kellogg independently reviewed and evaluated the actual laboratory technician's work, made his own independent judgments based on the data, and testified about his interpretation of the lab work for the members. Among other things, he testified about the forensic testing done on the red blanket, which detected semen that further analysis "matched" to Appellant's DNA profile. Appellant's trial defense counsel did not object to this testimony at trial.

Appellant asserts his trial defense counsel were ineffective for failing to object to Dr. Kellogg's testimony about the forensic testing and DNA comparisons instead of the lab technician who actually conducted the tests. Appellant argues this violated his right to confrontation under *Crawford v. Washington*, 541 U.S. 36 (2004). We disagree.

As our superior court has held, a substitute expert may testify regarding his independent conclusions based on the results (the underlying data) of laboratory testing performed by another technician, who is unavailable at trial, without offending the Confrontation Clause as interpreted under *Crawford. United States v. Katso*, 74 M.J. 273, 279, 284 (C.A.A.F. 2015). That is precisely what Dr. Kellogg did here. Hence, Appellant has not shown that had his trial defense counsel raised the issue at trial, there is a reasonable probability such an objection would have been meritorious. To the contrary, we are confident it would not have been.

Even assuming *arguendo* his counsel's performance was deficient in this regard, Appellant has failed to show how such deficiency resulted in prejudice. Dr. Kellogg's testimony supported that Appellant's semen was found on the red blanket, which Appellant told the NCIS agent would be expected because he had ejaculated onto it. We fail to see how expert testimony that corroborated Appellant's statements and supported the Defense theory of the case caused prejudice to Appellant.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred. UCMJ arts. 59, 66. The findings and sentence are **AFFIRMED**.

Chief Judge Emeritus CRISFIELD and Judge STEWART concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court